UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------

In re:                              :
                                    :     Case No. 20-22614
   EDISON PRICE LIGHTING, INC.      :     White Plains, New York
                                    :     July 10, 2020
                          *Debtor.* :
--------------------------------


Transcript - Case No. 20-22614
Before the Honorable Robert Drain
United States Bankruptcy Judge
Application to Employ Beechwood Capital Advisors, LLC and HunterPoint, LLC as Advisors filed by H. Bruce Bronson, Jr. on behalf of Edison Price Lighting, Inc. with presentment to be held on 6/26/2020 (ECF #59)
Affidavit/Supplemental Declaration of Peter A. Furman in support of Application to Employ Beechwood Capital Advisors, LLC and HunterPoint, LLC as Advisors (related document(s)59) Filed by H. Bruce Bronson, Jr. on behalf of Edison Price Lighting, Inc. (ECF #70)
Affidavit/Supplemental Declaration of Richard Conroy in support of Application to Employ Beechwood Capital Advisors, LLC and HunterPoint, LLC as Advisors (related document(s)59) Filed by H. Bruce Bronson, Jr. on behalf of Edison Price Lighting, Inc. (ECF #71)
Interim Hearing of Cash Collateral (If Necessary)
Motion to Compel -- Motion of United Development Venture, LLC to compel payment of accrued post-petition rent pursuant to 11 U.S.C. 365(d)(3), or in the Alternative for an Order Deeming its Lease Rejected and Modifying the Automatic Stay to Allow Movant Landlord to Pursue its State Court Remedies
Citibank's Objection to Motion of United Development Venture, LLC (ECF #65)
Objection to Motion (related document(s)63) filed by H. Bruce Bronson, Jr. on behalf of Edison Price Lighting, Inc.


A P P E A R A N C E S :


*For the Debtor:*                  H. Bruce Bronson, Esq.
                                   Bronson Law Offices, P.C.
                                   480 Mamaroneck Avenue
                                   Harrison, New York 10528
                                   (914) 827-5238

| | |
|---|---|
| *For Edison Lighting Executives:* | Carlos Cuevas, Esq.<br>1250 Central Park Avenue<br>Yonkers, New York 10704<br>(914) 964-7060 |
| *For American Express:* | Paul Hooten, Esq.<br>Paul J. Hooten & Associates<br>5505 Nesconset Highway<br>Mt. Sinai, New York 11766<br>(631) 331-0547 |
| *For United Development Venture, LLC:* | David Yan, Esq.<br>David Yan Law Office<br>136-20 38th Avenue, Suite 11E<br>Flushing, New York 11354<br>(718) 888-7788 |
| *For Citibank:* | Stuart Glick, Esq.<br>Anthony Pirraglia, Esq.<br>Thompson & Knight, LLP<br>900 Third Avenue, 20th floor<br>New York, New York 10022<br>(212) 751-3001; Fax (212) 751-3113 |
| *Transcript produced by:* | Pro-To-Type<br>17 Fifth Street<br>Middletown, New York 10940<br>(845) 342-0192 |

1           THE COURT:  In re: Edison Price Lighting, Inc.

2           MS. SCHWARTZ:  Good morning, Your Honor.  Bruce

3    Bronson on behalf of the Debtor, Edison Price.

4           THE COURT:  Good morning.

5           MR. HOOTEN:  Good morning, Your Honor.  Paul Hooten

6    here on behalf of American Express.

7           THE COURT:  I'm sorry.  That was Paul Hooten?

8           MR. HOOTEN:  Yes.

9           THE COURT:  Okay.  Good morning.

10          MR. YAN:  Good morning, Your Honor.  David Yan on

11   behalf of United Development Venture, LLC.

12          THE COURT:  Good morning, Mr. Yan.

13          MR. YAN:  Thank you, Your Honor.

14          MR. CUEVAS:  Good morning, Your Honor.  Carlos Cuevas

15   on behalf of Joel Siegel, Richard Shaver, and George Closs.

16   They are executives with the company.

17          THE COURT:  Okay.  I think, at least on my

18   connection, your name didn't come through clearly.  If you

19   could just state that again.

20          MR. CUEVAS:  Of course, Your Honor.  Carlos Cuevas on

21   behalf of Joel Siegel, Richard Shaver, and George Closs.  They

22   are executives with the company, Your Honor.

23          THE COURT:  Okay.  Good morning.

24          MR. PIRRAGLIA:  Good morning, Your Honor.  Anthony

25   Pirraglia and Stuart Glick from Thompson & Knight on behalf of

1    Citibank.

2            THE COURT:  Okay.  Good morning.  All right.

3            There are a number of matters on the calendar in this

4    case this morning.  The first two involve professional

5    retention and application that was made on notice of

6    presentment.  I haven't seen any objections.

7            Mr. Bronson --

8            MR. BRONSON:  Yes, Your Honor.  I've worked with

9    Andrea Schwartz on this, you know, over the last couple of

10   weeks.  She has no -- the UST has no objection to hiring the

11   professionals.  They had an objection to the way I wanted to

12   pay them, so we've basically agreed that the payment will just

13   be as usual where we'll just file a fee application and get

14   them paid.  The idea here was that these are -- these people

15   are putting in a lot of time and should be paid on an ongoing

16   basis, but at this point, I can do a quick fee application for

17   them that could be heard on our next date, which is August

18   14th, and I think that would take care of this issue, Your

19   Honor.

20           THE COURT:  Okay.  That's fine.  I had a similar

21   point here, particularly given, well, as far as Beechwood was

22   concerned, it really should be just a regular 330 application

23   process.

24           As far as HunterPoint is concerned, I gather that at

25   least one person from there is on-site or effectively on-site

1   but is not stepping into any role like CFO or crisis manager

2   but is simply a professional providing similar services;

3   correct?

4           MR. BRONSON:  That's correct, Your Honor.

5           THE COURT:  Okay.

6           MR. BRONSON:  Mr. Furman is basically providing a CRO

7   function, but he's not the CRO.

8           THE COURT:  All right.  So in light of that, I think

9   Miss Schwartz was right in saying that this should be dealt

10  with by a regular fee application process, and in light of that

11  and there being no other objection, and based on my review of

12  the motions, which I just happened to do since it was on

13  calendar today, I'll be granting the application.  There should

14  be two separate orders, one for Beechwood and one for

15  HunterPoint, and it should reflect the agreement that you've

16  just laid out on their being compensated under § 330 with

17  regular application.

18          MR. BRONSON:  Yes, Your Honor.

19          THE COURT:  Okay.  Now, we are also here on the

20  continued hearing on use of cash collateral.  I saw your email

21  to chambers from the other day saying that you were working on

22  an extension of the interim order.  I don't think I saw the

23  actual interim order as extended.  Has it been agreed at this

24  point?

25          MR. BRONSON:  Yes, it has, Your Honor, and I did send

Edison Price Lighting, Inc. -- 07/10/2020                    6

1    it to chambers and to your clerk, and I docketed it yesterday

2    as well.

3              THE COURT:  Okay.  Well --

4              MR. BRONSON:  What we laid out in a budget goes

5    through October 9th, but we're basically agreeing to the budget

6    through August 14th.

7              THE COURT:  Okay.  So I'll turn to the budget in a

8    second, but as far as the order is concerned, is it basically

9    the same as the last order, which I think was the third one,

10   except this will be a fourth one?

11             MR. BRONSON:  Exactly, Your Honor.  There's no major

12   changes, just minor changes.

13             THE COURT:  Okay.  And so as far as the budget is

14   concerned, other than increased expenses based on the Debtor's

15   now having greater access to its facility, are there any other

16   changes to the budget?

17             MR. BRONSON:  No, Your Honor.  We have rent being

18   paid monthly starting this month, which the check was delivered

19   yesterday, I believe, at the rate of $114,000, and we have

20   Citibank getting an adequate assurance payment of $17,000,

21   approximately $17,000, which was in the third interim budget,

22   also for a July payment.

23             THE COURT:  With the provision in the order saying

24   that that will be applied consistently with § 506 of the Code.

25             MR. BRONSON:  Well, it says it's going to be applied

Edison Price Lighting, Inc. -- 07/10/2020                    7

1  | to principal.

2  |          THE COURT:  Okay.  Well, that's even better to its

3  | allowed claim and to the principal.  So I don't know if anyone,

4  | unlike me, has had a chance to review the proposed order and

5  | budget or is just prepared to go based on the representations

6  | on the record today to -- if they wanted anything more to say

7  | on the cash collateral.

8  |          MR. YAN:  Your Honor, for the post-amendment order

9  | cash (inaudible), I have an RCNA budget for the payment of the

10 | rent, post-petition rent, for May and June as well as the

11 | property tax and insurance.  The landlord has to pay the

12 | mortgage to the (inaudible).  They have to collect the monthly

13 | mortgage payments, property tax, and insurance and (inaudible)

14 | has not been able to pay almost for three months.  I believe

15 | the bank has already issued a warning letter.  If the landlord

16 | still fails to pay the monthly mortgage, including the property

17 | tax and insurance, then the bank will probably start some

18 | proceedings to enforce the payments.

19 |          I think the budget should include that the monthly

20 | rent payments for rent, additional rent for May and June, that

21 | the Debtor's counsel, Bruce Bronson, told us that they ordered

22 | an express that the rent payment for July 2020 but does not

23 | want to pay any property tax and insurance.  That's really

24 | prejudices the landlord.

25 |          THE COURT:  All right.  Well, we will get to the

1    landlord's motion to compel payment for the two months that are

2    not being covered in a moment.

3            But related to that and to the budget, Mr. Bronson,

4    what do the projections show, and I'm assuming given the work

5    that you and your client have done with the lender, Citibank,

6    there was a fair amount of due diligence on the projections.

7    What do they show after payment of the budget item as there

8    being any surplus to the Debtor?

9            MR. BRONSON:  There is not much in the way of

10   surplus.  There is some.  It goes down on August 14th.  It

11   actually dips to about I think its lowest amount of about

12   $45,000, and --

13           THE COURT:  Just so you know, I have pulled it up.  I

14   do see your email from yesterday.

15           MR. BRONSON:  Okay.

16           THE COURT:  So I'm looking --

17           MR. BRONSON:  What's really positive here is that the

18   accounts receivable billed quickly and billed pretty well.  The

19   problem is there's always a 45- to 60-day timing between

20   shipping and getting paid.  The normal terms are 30 days, so 45

21   to 60 days is what we're using.  So the business is coming back

22   online, and it's getting new orders every week from about

23   $80,000 to $100,000 of new orders, and it has this backlog and

24   it has a good amount of released work, which is stuff that can

25   actually be completed and shipped and paid for, but it takes

1   time to bring it back fully to where there's good cash flow

2   coming in.

3          THE COURT:  All right.  When is the next tax payment

4   due in respect to the lease?

5          MR. YAN:  Tax payment, I believe that's by every half

6   year.  The property was, I believe, July 1st for the next six

7   months of the property tax.  For the first quarter, I mean

8   first quarter and second quarter of 2020 to 2021 and past

9   property tax already owed, I believe they tried to borrow some

10  money, find somewhere else to pay the past tax due for 2019 to

11  2020, the fourth quarter of the property tax, and that's in the

12  motion.  I believe that the property tax every month is about

13  -- for May and June, it's $20,791.55, and for July and ongoing

14  every month, it's about $21,964.90 a month.  Translated to

15  quarterly, it's about $65,000.00 a quarter for the property

16  tax.

17         THE COURT:  So when is the property tax actually

18  owed?  Not by the Debtor but to the taxing authority?

19         MR. YAN:  I don't know.  I need to find out from the

20  landlord.  They provided me the information about property tax

21  owed for post-petition from May, June, and July is $63,548.00.

22         THE COURT:  Well, I don't, I mean, I'm not that

23  familiar with the taxing period for this particular location,

24  but I don't believe they're being billed monthly by the taxing

25  authority.

1          MR. YAN:  You are right.  You're correct.  It's

2     billed quarterly, Your Honor.

3          THE COURT:  Okay.

4          MR. YAN:  But based on the lease, the landlord has to

5     bill -- I mean, the practice, when they receive a bill from

6     their taxing authority up in New York City, then they would

7     prepare a billing to the tenant for the tax due but broken down

8     monthly.  The landlord pays quarterly to the New York City

9     Department of Finance and Taxation.

10          THE COURT:  So, Mr. Bronson and Mr. Yan, either of

11     you can answer this question, in reviewing the Debtor's

12     objection to the landlord's motion to compel payment, I noted

13     that the Debtor objected to any liability under the lease

14     beyond the stated monthly rent of $114,000.  Pre-petition, did

15     the Debtor pay in addition to that amount additional rent in

16     the form of taxes?

17          MR. YAN:  Yes, Your Honor.  Before the petition, the

18     additional rent owed by the tenant, the Debtor in possession,

19     before October 2019, they paid the rent and additional rent

20     including the property tax and insurance.  They never disputed

21     these amounts because these amounts, that's mandated by the

22     lease.  The tenant has to pay the property tax and insurance,

23     and since October 2019, the tenant failed to pay the rent, but

24     the tenant cut three checks to pay the October 2019 rent but

25     with insufficient funds.  That's the fraudulent debt obtained

1    by the tenant, and since October 2019 to now, tenant has not

2    paid, maybe they paid the July 2020 rent, but the tenant has

3    not paid since October 2019 up to now rent, additional rent,

4    covering the property tax and insurance.  But before that, they

5    paid.

6          THE COURT:  So, Mr. Bronson, what is the argument

7    that the Debtor is not liable to pay the property taxes and

8    insurance?

9          MR. BRONSON:  Your Honor, as far as the property tax,

10    I don't believe we said that the Debtor is not liable to pay

11    it.  I believe we said that the terms under the lease require

12    presenting that tax bill and actually billing us for it, which

13    had not been done.

14          THE COURT:  All right.

15          MR. BRONSON:  And the insurance is different, Your

16    Honor.  The insurance has always been disputed because there's

17    double insurance on this building.  The Debtor is carrying

18    insurance and is required to carry insurance, and then the

19    lease has a provision that the Debtor will reimburse the

20    landlord for insurance, and it's double insurance and it, you

21    know, it's not proper.

22          THE COURT:  Well, is the building insured?

23          MR. BRONSON:  Yes, Your Honor.

24          THE COURT:  Does the Debtor has a policy naming the

25    landlord as a (inaudible)?

1           MR. BRONSON:  Yes, it does, Your Honor.

2           THE COURT:  Okay.  All right.  So when did the Debtor

3    resume operations at the building?

4           MR. BRONSON:  I believe June '19.

5           THE COURT:  Okay.  And was it limited in doing so, or

6    did the operations actually resume then?

7           MR. BRONSON:  Operations resumed on a small scale.

8    The plant needed to be cleaned.  People are being brought back

9    gradually, and I don't think everybody will be brought back,

10   but it's building as manufacturing is lined up for various

11   projects.

12          THE COURT:  Okay.  So it does seem to me, the way the

13   lease reads, that there needs to be an amount of taxes actually

14   shown to the Debtor before they're owing under the lease.  On

15   the other hand, I think the cash collateral budget should

16   include an item for payment of taxes, a projected item, and

17   based on what I've heard and looking at the budget, although

18   it's very small print, it looks like the Debtor would be able

19   to do that.  However, it may fall within the $114,000 that you

20   already have allocated there.  If it turns out that the Debtor

21   cannot make both payments, the tax payment should come ahead of

22   the rent payment, and we'll get to that when we turn to the

23   motion to compel payment of the rent from the petition date

24   through I guess the July payment and ongoing and why I reached

25   that conclusion.

1          But as far as adequate protection of the landlord's

2    interest, the tax does need to be paid, although it should be

3    paid only as per a proper notice as to what's owing as opposed

4    to some sort of monthly estimation for the post-petition

5    period.

6          MR. CUEVAS:  Your Honor, this is Carlos Cuevas.  I

7    checked on the New York City Department of Finance website, and

8    if the property's assessed value is greater than $250,000, then

9    there are two tax payment dates during the year, July 1st and

10   January 1st.

11         THE COURT:  Right.

12         MR. CUEVAS:  It's not billed on a monthly basis, Your

13   Honor.

14         THE COURT:  No.  I didn't think it would be, but in

15   any event, July 1st has already happened, so before it becomes

16   -- before it starts to give rise to either a lien or penalties,

17   there should be a provision for the payment of the taxes.

18         As I noted, if it turns out that the Debtor doesn't

19   have the money to make that payment and the monthly rent

20   payment, the monthly rent payment should be reduced to enable

21   the taxes to be paid.

22         MR. CUEVAS:  Understandable.

23         THE COURT:  So that may give you a preview into how

24   I'm doing the landlord's motion to compel payment, which we'll

25   turn to now under § 365(d)(3).

Edison Price Lighting, Inc. -- 07/10/2020          14

1          You should assume, both of you, and I know that

2   Citibank has also filed an objection to this motion, that I've

3   reviewed the pleadings on it and, frankly, I think the

4   discussion that we just had has answered my questions about it.

5   So my inclination is to give you my preliminary ruling on it

6   and then give you a chance to address that ruling before I make

7   it final and persuade me that some portion of it should be

8   changed.

9          § 365(d)(3) requires, at least states -- I'd ask

10  everyone to put themselves on mute unless they're going to be

11  speaking so there's no talking over what I'm saying and the

12  people in the case can actually hear my preliminary ruling and

13  focus on it.

14          § 365(d)(3) --

15          Look.  I'm only going to say this one more time, and

16  we will drop you from the call if you don't do what I tell you

17  to do.  Put your phone on mute.  All right.

18          § 365(d)(3) states that the Trustee shall timely

19  perform all the obligations of the Debtor, except those

20  specified in § 365(b)(2) which doesn't apply here, arising from

21  and after the order for relief under any unexpired lease of

22  non-residential real property until such lease is assumed or

23  rejected, notwithstanding § 503(b)(1) of this title.

24          The Code's reference and Trustee here also include

25  the Debtor in Possession, which would include this Debtor in

1   Possession, and the phrase notwithstanding § 503(b)(1) of this

2   title takes out of consideration with respect to the

3   obligations of the Debtor under a lease of non-residential real

4   property.  The general case law, as set forth in McFarland v.

5   Bethlehem Steel and numerous other cases, that an

6   administrative expense is allowed only to the extent of the

7   benefit to the Debtor's estate, i.e. here the contract governs.

8          The Court may extend the time to perform for 60 days

9   after the petition date but no longer.  Based on that section,

10  and given that it has not been paid any rent under the lease

11  for -- any additional rent under the lease for the period from

12  the petition date at least until July, the landlord has moved

13  to compel payment via Debtor and the secured creditor,

14  Citibank, which has a lien on the Debtor's cash, have objected

15  to this motion on two primary grounds, the first being that

16  § 365(d)(3), notwithstanding it says the Debtor shall timely

17  pay, does not have a specific remedy attached to it, and under

18  applicable case law, including cases in this district but

19  elsewhere as well, the ultimate remedy for nonpayment is an

20  administrative expense claim in the amount of the obligations

21  due under the lease.

22          That is especially the case where it appears that the

23  Debtor may be administratively insolvent, or at the moment may

24  have a cash flow problem that would mean that it could not make

25  all or some portion of the payment compounded by the fact, as

1    is often the case and in this case here, that the Debtor's cash

2    is subject to a lien, in this case Citibank.

3           In addition to that argument, the objectors point out

4    that due to the stay in place orders issued by the Governor of

5    New York, the Debtor was not able to use the leased property

6    for a major portion of the post-petition period, and it has

7    been confirmed on today's record that the Debtor only began to

8    reopen the premises for manufacturing in the third week of

9    June.

10          The effect of COVID-19-related governmental shutdowns

11   has been dealt with by Bankruptcy Courts in various cases, two

12   of which are cited by the objections.  First, (inaudible) an

13   order in the Modell's case in New Jersey, and secondly in in

14   re: Pier 1, that's number 1, Imports, Inc., 2020 Bankruptcy

15   Lexis 1242, Bankruptcy E.D. Virginia, May 10, 2020.

16          Both of those decisions involve motions by Debtors

17   that were large retailers with many leased properties.  The

18   motions addressed by those Courts dealt with blanket requests

19   by Debtors either to suspend proceedings in the case under

20   § 305 of the Bankruptcy Code, which was the request in the

21   Modell's case, or alternatively, simply to be relieved of the

22   payment obligation under § 365(d)(3).

23          Here, there's no request to suspend proceedings and

24   no need to since we're dealing with only one lease and one

25   landlord.  The Pier 1 Imports case, however, notes what I

20-22614-rdd   Doc 98-1   Filed 08/13/20   Entered 08/13/20 13:52:33   Transcript of
hearing on July 10   2020   Pg 17 of 28
Edison Price Lighting, Inc. -- 07/10/2020          17

1    believe is the majority and vast majority view that § 365(d)(3)

2    does not have a remedy section in it, and ultimately the

3    requirement to timely perform gives rise, if timely performance

4    is not given, to an administrative expense and/or the right to

5    seek relief from the automatic stay by the landlord, which is

6    based on a different set of considerations, namely adequate

7    protection of the landlord's interest and/or conceivably a

8    motion to compel assumption or rejection.

9          The Pier 1 case cited the Eastern District of

10   Virginia's own precedent in re: Circuit City Stores, Inc., 447

11   B.R. 475, 510, Bankruptcy E.D. Virginia, 2009, for that

12   proposition.  See 2020 Bankruptcy Lexis 1242 at page 15 and 16.

13   The Court went on to state that the landlord had a separate

14   right -- or all landlords would have a separate right to added

15   protection under § 361 and 363 of the Bankruptcy Code that

16   where the Debtor was paying insurance, utilities, and taxes,

17   the landlord was adequately protected.

18         The law in the Southern District of New York is

19   similar to the Circuit City case going back to in re: Wedtech

20   Corp., 72 B.R. 464, Bankruptcy SDNY 1996 at 761, which was

21   favorably cited by the Second Circuit in re: Burger Boys, 94

22   F3d 755, 761, Second Circuit, 1996.  I think I may've given you

23   the wrong cite on Wedtech Corp.  72 B.R. 464, Bankruptcy SDNY

24   1987.  In a similar provision, namely § 1114(e)(1) of the

25   Bankruptcy Code, which also says that the Debtor shall timely

1   pay the obligation required thereunder.  This Court at in re:

2   Ace, A-c-e, Elevator Company, 347 B.R. 473, 489, Bankruptcy

3   SDNY, 2006, reached the same result.  The amount is fixed, but

4   the remedy does not require immediate payment where there are

5   legitimate concerns as to either cash flow or administrative

6   solvency.

7          In addition, and this is an issue that was not

8   addressed in the Modell's and Pier 1 cases, I want to raise an

9   issue with the parties as to both the lease and the applicable

10  state law, because again, § 365(d)(3) requires timely payment

11  or timely performance of all obligations under the lease.

12         The Debtor was required by the stay in place orders

13  of the Governor of New York to exit the property for at least a

14  month and three-quarters.  The lease does have a condemnation

15  provision in paragraph 19 that's fairly broadly worded and

16  gives the tenant a right to proration of rent for the period of

17  condemnation.

18         Moreover, paragraph 8 laying out the remedies of the

19  landlord, has in the introductory section a caveat, quote,

20  unless tenant shall have heretofore made good faith efforts to

21  cure such default as provided in this paragraph.

22         In addition, the Courts in New York have long

23  recognized an implied covenant in contracts and leases

24  sometimes phrased as the impossibility doctrine, or in other

25  cases, the frustration doctrine, which relieves a party charged

1   with performance, including a tenant, where the circumstances

2   constituting impossibility or frustration can be shown.

3          Normally, this doctrine is narrowly construed.  It

4   applies only when performance is rendered objectively

5   impossible by an unanticipated event that could not have been

6   foreseen or guarded against in the contract.  See Axginc, A-x-

7   g-i-n-c, Corp. v. Plaza Automall, Ltd., 759 Fed. Appendix 26,

8   29, Second Circuit, 1918; and Kel, K-e-l, Kin, K-i-n, Corp. v.

9   Century Markets, Inc., 70 NY2d 900, 902, 1987.

10          Normally, the excuse of impossibility is limited to

11   destruction of the means of performance by and act of God,

12   force majeure, or by law, including governmental action.  47

13   East 61st Garage, Inc. v. Savoy Fifth Avenue Corp., 23 NY2d

14   275, 281, 1968.

15          Nevertheless, where a tenancy is completely precluded

16   by governmental action, the doctrine may apply if there's no

17   way around that problem. The 119 Fifth Avenue, Inc. v. Taiyo

18   Trading Company, 190 Misc. 123, 125, affirms 275 AD 695, First

19   Department, 1949.  See also Gardiner Properties, Inc. v. Samuel

20   Lieder, L-i-e-d-e-r, & Son, Inc., 190 Misc. 824, 825, New York

21   Supreme, 1951, reversed on other grounds, 279 A.D. 470, First

22   Department, 1952.

23          In both of those cases, the Courts recognized where

24   an unanticipated event occurred that could be shown to have

25   precluded performance.  The doctrine would apply to a tenant.

1    In the first case, a store was leased to a tenant of Japanese

2    origin, and after Pearl Harbor, the alien property custodian

3    seized the contents of the store and the tenant was forced to

4    vacate the premises.  The Court denied a motion for summary

5    judgment, stating that it needed more facts to determine

6    whether performance was, in fact, precluded, but it clearly

7    recognized the doctrine.

8          Similarly, in the Gardiner Properties case, the

9    tenant was precluded by governmental action from building a

10   theater in the leased premises and argued the impossibility or

11   frustration doctrine.  Since there was a 90-year lease, the

12   Court ultimately, and this is how it was reversed, determined

13   that since there was 90 years left, at some point frustration

14   would not occur.  The Appellate Division reversed saying you

15   needed a trial on that point, but the lower court recognized

16   that for the period when the property could not be used as

17   specifically contemplated by the parties, the tenant would owe

18   rent.  See Restatement (Settling) of Property: Landlord &

19   Tenant, § 9.3.

20         So it would appear to me there's a very good argument

21   here that the very purpose of the lease, i.e. to occupy the

22   premises and manufacture the good there, was made impossible or

23   frustrated by the Governor's stay in place orders, and

24   therefore that the doctrine of impossibility or frustration

25   would apply, at least for the duration of those orders.

1          No one raised that issue except me, so I believe that

2     the issue should be briefed, and frankly, there may need to be

3     some sort of evidentiary hearing on it.  But in the meantime,

4     given that issue and the Debtor's financial position, it

5     appears to me that the motion should be denied at this time,

6     albeit as I noted earlier to still require the Debtor to pay

7     adequate protection in the form of maintaining the insurance,

8     paying the taxes when shown to be due, and otherwise

9     maintaining the property.  But that requirement does not go

10    further to require ongoing payment of rent.

11         As noted in the Wedtech case, and as is clear here,

12    lifting the stay based on nonpayment of rent would be a futile

13    effort given that Citibank has a lien on the assets, including

14    the cash, and the only way ultimately for the landlord to get

15    paid on an ongoing basis is for the Debtor to be sold as a

16    going concern or to generate sufficient revenues to resume

17    payments in full.

18         So that's my preliminary ruling.  I don't know if

19    anyone has anything further to say on it.  Otherwise, it'll

20    become my actual ruling.

21         MR. YAN:  Your Honor, if I may --

22         THE COURT:  Go ahead.

23         MR. YAN:  Yeah.  We heard, Your Honor, the points

24    regarding the frustration or impossibility to perform; however,

25    I believe the (inaudible) is trumped by federal -- the Congress

20-22614-rdd   Doc 98-1   Filed 08/13/20   Entered 08/13/20 13:52:33   Transcript of
hearing on July 10   2020   Pg 22 of 28
Edison Price Lighting, Inc. -- 07/10/2020                22

1   up to this point has not helped any (inaudible) not be paid

2   during their shutdown under Governor Cuomo's order to

3   (inaudible) to go home.

4            THE COURT:  Well, except, sir, the statute actually

5   says, again, that the Trustee shall timely perform all

6   obligations of the Debtor under any unexpired lease for

7   nonresidential real property.  The doctrine of impossibility or

8   frustration is an implied term in the lease.  When you take a

9   look at the primary case that I've cited, the Taiyo case,

10  you'll see that rationale for the doctrine.  So Congress didn't

11  create a new contract, it simply requires timely performance

12  under the contract, and if applicable contract law relieves the

13  party of the obligation to pay under the contract, then

14  Congress doesn't require payment.

15           MR. YAN:  And I believe (inaudible) very huge

16  implication on the other real property on a commercial lease,

17  and I don't believe that's in the order that commercial tenants

18  can do to the order of the governor (inaudible) can avoid

19  payment of this kind of rent for the duration that --

20           THE COURT:  You could brief that issue.  Thus far,

21  there's one case that we could find dealing with a COVID

22  obligation or an excuse of impossibility based on COVID, and

23  while recognizing the general principal, it didn't apply it on

24  those facts because there were individual defendants alleging

25  the doctrine of impossibility, and they had made no showings

1    that their own assets prevented them, or they were unable to

2    pay, based on their own assets.  It wasn't a landlord/tenant

3    case.  Lantino v. Clay, LLC, 2020 WL 2239957 SDNY, May 8, 2020.

4          So I appreciate this will shake out and have major

5    consequences in New York and elsewhere over time.  Your client

6    may end up making the same arguments to its lender, for

7    example, that the doctrine of impossibility precludes your

8    client's tenant from paying it rent, and it has no other ways

9    to pay its lender, maybe it has an excuse too.  But for now,

10   based on the two reasons that I stated, I don't see any

11   requirement to actually pay the amounts outstanding at this

12   time, and again, I appreciate that I raised this issue myself,

13   and for that reason, I would certainly authorize further

14   briefing, but the point being it may be that the Debtor never

15   owes that money, and that's what the parties should be

16   briefing.

17         I don't view that as something that needs to be done

18   on an expedited basis because the Debtor's own cash flow issues

19   still preclude payment going forward anyway, which under the

20   Wedtech, Pier 1, and other cases would relieve it of the need

21   to make the payments.

22         MR. YAN:  Your Honor, for this issue, I believe that

23   we have the right of bank counsel to come in to provide

24   amicable brief and probably this would have huge implications.

25   Maybe we should look at the other party to come in.

1          THE COURT:  I don't think so.  I mean, I don't think

2     your client's bank would be a party and interest in this case

3     on this issue.  I'm not ruling on impossibility as to your

4     contract with your bank.

5          MR. YAN:  Because that their landlord, it's not

6     (inaudible) to make the monthly --

7          THE COURT:  It's a separate set of facts, as I noted,

8     the cases that I cited are all in the context of denying

9     motions on the pleadings or for summary judgment.  They needed

10    more facts.  It's a fact-based determination as the cases in

11    the restatement that I cited make clear, so I'm not going to

12    start determining all up through the chain of contracts.  I'm

13    just focusing on the lease between this Debtor and your client.

14         MR. YAN:  And, Your Honor, also that's the shelter in

15    place order by Governor Cuomo did not start until March 20.

16    Probably we need more time, about 30 or 45 days, to submit the

17    brief.

18         THE COURT:  That's fine.  Again, I leave it up to the

19    parties.  I don't view this as something that needs to be done

20    on an expedited basis.  You may well want to discuss with the

21    Debtor through Mr. Bronson the sale process that is in place

22    because, frankly, that is probably the best opportunity for

23    your client to get paid in any event rather than incurring

24    extra costs now.

25         MR. YAN:  I --

1            THE COURT:  Let me finish, sir.  And I think that it

2    probably would need to be briefed in the context of a motion to

3    assume the lease because obviously there's the cure issue, so

4    that's the outside date as far as the briefing on this point is

5    concerned.  So I recommend that you speak with Mr. Bronson

6    about the timetable for the sale process before the two of you

7    set a briefing schedule on whether there is any claim for the

8    prepetition period, and if so, for what portion of the period,

9    etc.

10            MR. YAN:  Your Honor, one more question.  On the

11    issue about (inaudible) for October 2019 rent that the Debtor

12    provided the rent check but it was returned for insufficient

13    funds.

14            THE COURT:  Right.  That's a claim.  You have a

15    prepetition claim for those unpaid amounts.

16            MR. YAN:  Right.  Since it's not dischargeable, do we

17    have to start under the motion, I mean adversary proceedings?

18            THE COURT:  Read the Bankruptcy Code.  Read 523.

19    There are only limited instances where a non-individual has a

20    debt that is non-dischargeable.

21            Okay.  So, Mr. Bronson, I'll look for two orders from

22    you, first the order providing for further interim use of cash

23    collateral.  I think with the budget, you just need to have an

24    asterisk that says that of that $114,000 budgeted, unless the

25    Debtor's able to make the tax payment separately, that amount

1   will be used to pay the taxes.

2          MR. BRONSON:  Yes, Your Honor.

3          THE COURT:  And then secondly, an order denying the

4   motion to compel immediate payment --

5          MR. BRONSON:  Yes, Your Honor.

6          THE COURT:  -- without prejudice to the party's

7   rights as to the actual amount owed as an administrative

8   expense that is not being paid.

9          You don't have to formally settle either of those

10  orders, but you should provide a copy -- obviously you're going

11  to be working through it with Citibank, but also provide a copy

12  to Mr. Yan --

13         MR. BRONSON:  Certainly.

14         THE COURT:  -- you know, shortly before you email

15  chambers so he can make sure it's consistent with my ruling.

16         MR. BRONSON:  Certainly, Your Honor.

17         THE COURT:  Okay.  Anything else in this case?

18         MR. YAN:  Yes.  The last issue about the insurance,

19  Your Honor.  The Debtor has their own insurance; however, all

20  insurance has to be approved by the lending institutions.  If

21  the Debtor in Possession has to use their own insurance, they

22  have to provide a binder to us so that we can provide it to the

23  lender for review and approval.

24         THE COURT:  That's fine.  I didn't understand that

25  that had not been done.  If it's not been done, Mr. Bronson,

1    you should send proof of insurance to Mr. Yan.

2              MR. BRONSON:  Absolutely.

3              THE COURT:  Okay.

4              MR. BRONSON:  No problem with that.

5              THE COURT:  That should be done promptly.  I guess

6    that would be the binder.

7              MR. BRONSON:  Yes, Your Honor.  No problem.  We'll do

8    that today.

9              THE COURT:  Okay.  Very well.  All right.  Anything

10   else?

11             MR. BRONSON:  I don't think so, Your Honor.

12             THE COURT:  All right.

13             MR. BRONSON:  We have a date of August 14th on the

14   interim order, and I would queue up the fee applications for

15   the two professionals so they could start getting some

16   payments.

17             THE COURT:  Okay.  Has Miss Lee cleared that date?

18             MR. BRONSON:  She's cleared that date for the interim

19   order.

20             THE COURT:  That's fine.  You can put the other stuff

21   on then too.

22             MR. BRONSON:  Okay.  Thank you, Your Honor.

23             THE COURT:  Okay.  All right.  Very well.

24                        (PROCEEDING CONCLUDED)

25

1                                CERTIFICATION

2

3          I, Diane C. Genender, certify that the foregoing is

4    a correct transcript from the sound recording in the above-

5    entitled matter.

6    Dated:   July 15, 2020

7

8

9    _____

10                    Signature of Approved Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25