Bronson Law Offices, P.C.
*Counsel for EDISON PRICE LIGHTING, INC.*
*Debtor and Debtor in Possession*
480 Mamaroneck Avenue
Harrison, New York 10528-0023
(914) 269-2530 (tel.)
(888) 908-6906 (fax)
Bruce Bronson, Jr., Esq.
hbbronson@bronsonlaw.net

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

..........................................................................x
|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| EDISON PRICE LIGHTING INC., | : | Case No. 20-22614 (RDD) |
|  | : |  |
| Debtor. | : |  |

..........................................................................x

**DEBTOR'S MOTION FOR ENTRY OF ORDERS, PURSUANT TO 11 U.S.C. §§ 105(A), 363(B), (F), AND (M), AND 365, 503 AND 507 AND RULES 2002, 6004 AND 6006 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE: (I) (A) APPROVING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS, (B) AUTHORIZING AND APPROVING ENTRY INTO THE STALKING HORSE APA, (C) APPROVING THE DESIGNATION OF THE PURCHASER AS THE STALKING HORSE BIDDER, (D) APPROVING BID PROTECTIONS, (E) SCHEDULING A SALE HEARING, (F) APPROVING THE FORM, MANNER AND EXTENT OF NOTICE OF THE SALE PROCESS, AND (G) APPROVING CONTRACT ASSUMPTION AND ASSIGNMENT PROCEDURES; AND (II) (A) APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES, AND (B) GRANTING RELATED RELIEF**

TO THE HONORABLE ROBERT D. DRAIN, UNITED STATES BANKRUPTCY JUDGE:

EDISON PRICE LIGHTING, INC. (the "Debtor") by its undersigned counsel, submits this motion (the "Sale Motion") seeking entry of orders, pursuant to sections 105 (a), 363(b), (f), and (m), and 365, 503 and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 6004-1, 6006-1, 9006-1, 9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"):

I.        in substantially the same form as that annexed hereto as <u>Exhibit A</u> (the "<u>Bidding Procedures Order</u>"),[1] (a) authorizing the Debtor to conduct the sale process in accordance with the Bidding Procedures attached as <u>Exhibit "1"</u> to the Bidding Procedures Order (the "<u>Bidding Procedures</u>") for the auction, if necessary (the "<u>Auction</u>"), and sale of the Assets (as defined herein) free and clear of all liens, claims, encumbrances, and interests (collectively, "<u>Liens</u>"), (b) approving the Bidding Procedures, (c) authorizing and approving the Debtor's entry into the Agreement of Purchase and Sale (the "<u>Stalking Horse APA</u>"), among the Debtor and Current Lighting Solutions, LLC, 1975 Noble Road, East Cleveland, OH 44112 (the "<u>Stalking Horse Bidder</u>" or the "<u>Purchaser</u>"), substantially in the form attached hereto as <u>Exhibit C</u>, subject to higher and better offers, (d) approving the bidding protections in the form of the Expense Reimbursement and Break-Up Fee (each as defined herein), (e) scheduling the Auction and hearing for approval of the proposed sale (the "<u>Sale Hearing</u>"), (f) establishing procedures ("<u>Assignment Procedures</u>") for the assumption and assignment of the Debtor's executory contracts and unexpired leases (the "<u>Assigned Contracts</u>") and the fixing of cure amounts to be paid with respect thereto pursuant to section 365(b) of the Bankruptcy Code (the "<u>Cure Amounts</u>"), (g) authorizing and approving the form and manner of notice of the Auction and Sale Hearing (the "<u>Sale Notice</u>"), substantially in the form attached as Exhibit "2" to the Bidding Procedures Order, and (h) authorizing and approving the form and manner of notice of the potential assumption and assignment of the Assigned Contracts and the proposed Cure Amounts, substantially in the form attached as Exhibit "4" to the Bidding Procedures Order; and

II.       in substantially the same form as that annexed hereto as <u>Exhibit B</u> (the "<u>Sale Order</u>"), (a) approving the Stalking Horse APA, or such other Purchase Agreement entered into in accordance with the Bidding Procedures and approved at the Sale Hearing, and authorizing the Debtor to perform thereunder, (b) approving the sale of the Assets to the Stalking Horse Bidder, or such other Successful Bidder as approved at the Sale Hearing, free and clear of any and all Liens, (c) authorizing the assumption and assignment of the Assigned Contracts, and (d) granting related relief (the "<u>Transaction</u>");

and respectfully sets forth as follows:

## <u>PRELIMINARY STATEMENT</u>

The Debtor is seeking to sell substantially of its assets (the "<u>Assets</u>"). The Assets consist

of (i) certain equipment of Debtor, (ii) all raw materials and works in process and finished good

---

[1] Contemporaneously herewith, the Debtor is filing a notice of presentment of the Bidding Procedures Order and a request for expedited relief in connection with same.

inventory of Debtor, (iii) all intellectual property of Debtor, and (iv) other assets and rights set forth in the Stalking Horse APA, specifically excluding cash and accounts receivable among other assets. The Stalking Horse Bidder is willing to expeditiously consummate the Transaction on or before October 30, 2020, as more fully set forth in the Stalking Horse APA, which provides for the sale of the Assets free and clear of all Liens for a purchase price of $1,110,000. The Transaction is subject to higher and better offers pursuant to the Bidding Procedures. As such, the Stalking Horse APA provides that in the event the Debtor closes on an Alternative Transaction (as defined in the Stalking Horse APA), the Stalking Horse Bidder is entitled to protections in the form of reimbursement of all reasonable and documented out-of-pocket expenses incurred by Stalking Horse Bidder in an amount not to exceed $75,000 (the "Expense Reimbursement") and payment of three percent (3%) of the negotiated purchase price as a break-up fee (the "Break-Up Fee" together with the Expense Reimbursement, the "Bid Protections").

For all the reasons stated below, the Debtor respectfully submits that entry of the proposed Bidding Procedures Order and Sale Order is in the best interests of the Debtor's estate and its creditors and should be approved.

## JURISDICTION, VENUE, AND STATUTORY PREDICATES

1.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York (Preska, C.J.), dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M) and (N).

2.      Venue of this case is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

3.     The statutory predicates for the relief sought herein are sections 105(a), 363(b), (f), and (m), 365, 503(b) and 507(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006 and 9014, and Local Bankruptcy Rules 2002-1, 6004-1, 6006-1, 9006-1, 9013-1, 9014-1 and 9014-2.

## BACKGROUND

### A.     Case Background

4.     On May 1, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code before this Court commencing Case No. 18-23419 (RDD).

5.     On July 21, 2020, the Court approved the retention of Beechwood Capital Advisors, LLC [Dkt No. 84] (the "Broker" or "Beechwood") for the purpose of marketing substantially all of the Debtor's assets for sale.

6.     The Debtor continues to manage its business as a debtor and debtor in possession pursuant to the Bankruptcy Code.

### B.     The Debtor's Assets

7.     The Debtor is a manufacturer of high-end architectural lighting that paused operations and furloughed its employees on March 20, 2020, in response to Governor Cuomo's "shelter in place" order due to Covid-19.

8.     The Debtor has returned to manufacturing in order to preserve its business as a going concern and is maneuvering through the various issues that are related to restarting business including supply chain issues.

9.     The Debtor leases a 60,000 square foot manufacturing facility where it maintains equipment and machinery necessary to produce its various lighting products.

10.     The Debtor owns a portion of its manufacturing equipment and leases a portion.

11.     The Debtor also has inventory, accounts receivable and a backlog of orders.

**C.      Security Interests, Tax Obligations and Other Claims**

12.     The Assets are subject to a first lien security interest held by Citibank, N.A. (the "Lender") in the amount of approximately $3,683,897.07.   Additionally, three (3) additional creditors have asserted junior secured claims on certain of the Assets.  *See*, *e.g.*, Claim Nos. 37, 39, 54.

13.     The Debtor also has significant unsecured debt as evidenced by scheduled claims and proofs of claim, including a priority claim of $2,055,428 asserted by the Internal Revenue Service.

**D.      The Purchase – Sale and Marketing Process**

14.     Prior to the Petition Date, the Debtor had been actively engaged in an informal marketing process to facilitate the sale of its business as a going concern.   Those marketing efforts were unsuccessful, which – in part – led to the commencement of this chapter 11 case.

15.     Since June 2019, the Broker has been engaged in an intense marketing process. The Broker's marketing campaign has included, among other things, targeted direct telephone, email, and fax solicitation to potential purchasers and all parties that had previously expressed an interest in acquiring the Assets; the creation of written marketing materials; maintaining a data room concerning the Assets so that interested parties could streamline their diligence.

16.     In total, the Broker contacted 60 potential purchasers, including parties that previously expressed interest in acquiring (all or a portion of) the Assets.  The Debtor executed confidentiality agreements with 15 interested parties and provided such parties access to a data room and other diligence materials.  As a result, the Debtor received three (3) offers to purchase the Debtor's enterprise as a going concern.

17. The Debtor, in consultation with the Broker, determined that the offer by the Stalking Horse Bidder would realize the highest and best value for the Assets. Accordingly, the Debtor engaged in negotiations with the Stalking Horse Bidder, resulting in the negotiation and execution of the Stalking Horse APA, which is attached hereto as **Exhibit C**.

## RELIEF REQUESTED

### A.    The Proposed Sale

18. The Stalking Horse APA sets forth the terms of the sale of the Assets, subject to higher and better offers, free and clear of Liens. The following is a summary of certain salient provisions of the Stalking Horse APA and is qualified entirely by reference to the Stalking Horse APA itself.[2]

| SUMMARY DESCRIPTION | |
|---|---|
| **Parties:** | Seller: Edison Price Lighting Inc.<br><br>Purchaser: Current Lighting Solutions, LLC, a Delaware limited liability company |
| **Assets:** | Substantially all of the Assets of Debtor as set forth in the Stalking Horse APA |
| **Purchase Price and Deposit:** | $1,110,000 purchase price<br>$111,000 deposit |
| **Sale Approval Order and Closing Date:** | Closing will take place on a date to be agreed between the Debtor and the Purchaser not later than fourteen days after entry of the Sale Order but no later than October 29, 2020, or as otherwise agreed by the parties in accordance with the Stalking Horse APA. |

---

[2] The following summary of the Stalking Horse APA is provided for the convenience of the Court and the parties in interest. To the extent that there are any discrepancies between this summary and the Stalking Horse APA, the terms and language of the Stalking Horse APA shall govern. Unless defined herein, capitalized terms defined in the Stalking Horse APA shall have the meanings ascribed to them therein.

| Cure Payments | Debtor shall be responsible for all Cure Amounts of any Assigned Contracts under the Stalking Horse APA, to the maximum extent of $65,000. |
| --- | --- |
| Transfer and Recording Taxes: | No Transfer and Recording Taxes are anticipated; however, if there are any, Purchaser will be liable for them. |

### B. Extraordinary Provisions

19.     In accordance with General Order M-383, In the Matter of: Adoption of Amended Guidelines for the Conduct of Asset Sales, dated November 18, 2009 ("General Order M-383"), the Debtor discloses the following Extraordinary Provisions provided for in the Stalking Horse APA:

(a)     Use of Proceeds:  At the Closing, the Debtor shall be required to use the proceeds of the Transaction in the first instance to satisfy the Debtor's indebtedness to Citibank, N.A.  In the event that higher and better offers are received on the Assets to permit recovery to junior lienholders, then the Debtor will use the proceeds for that purpose.

(b)     Record Retention.  The Stalking Horse APA provides that the Debtor will retain copies of all books and records.  The Debtor believes that it will maintain sufficient financial information for the Debtor to administer the estate.

(c)     Successor Liability:  The proposed  form of Sale Order contains findings and provisions limiting Purchaser's successor liability.  The parties intend that the transfer of the Assets will not subject Purchaser to any liability.  The proposed finding in the Sale Order authorizing the sale to be made free and clear of successor liability claims complies with applicable principles of sales conducted pursuant to section 363(f) of the Bankruptcy Code and applicable non-bankruptcy law.

(d)     Relief from Bankruptcy Rule 6004(h):  The proposed form of Sale Order contains a waiver of the stay imposed by Bankruptcy Rule 6004(h).  The Debtor submits such relief is appropriate under the circumstances.

## C.     Proposed Bidding Procedures, Auction and Auction Procedures

20.     Consistent with the Stalking Horse APA, the Debtor is proposing the Bidding Procedures, which are designed to facilitate an auction process and ensure the realization of maximum value of the Assets for the Debtor's estate, creditors, and other interested parties. Specifically, as discussed in more detail below, the Transaction is subject to higher and better offers.  In that regard, the Stalking Horse Bidder has expended considerable time, effort and resources conducting due diligence and negotiating the Stalking Horse APA.  Accordingly, the Stalking Horse Bidder required certain bidding protections to the extent it is outbid.

21.     The Debtor proposes that competing offers for the Assets be governed by the following Bidding Procedures:[3]

(a)     Relevant Dates and Deadlines:

| | |
|---|---|
| **Bid Deadline:** | **October 9, 2020 at 4:00 p.m. (EST)** |
| **Potential Auction:** | **October 11, 2020 at 10:00 a.m. (EST)** |
| **Deadline to File Notice of Selection of Highest and Best Bid:** | **October 12, 2020 at 4:00 p.m. (EST)** |
| **Sale Objection Deadline:** | **October 13, 2020 at 4:00 p.m. (EST)** |
| **Sale Hearing:** | **October 14, 2020 at 10:00 a.m. (EST)** |

(b)     Confidentiality Agreement / Due Diligence.  Any entity that wishes to conduct due diligence with respect to the Assets must deliver to the Debtor's counsel an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtor on terms at least as favorable to Debtor as the Confidentiality Agreement signed by the Stalking Horse Bidder.   Interested parties that comply with the foregoing (each such entity referred to as a "Potential Bidder"), shall be permitted to conduct diligence with respect to the Assets, provided however, that the Debtor shall not be obligated to furnish any due diligence information after the Bid Deadline.

---

[3] All parties should read the Bidding Procedures in their entirety and not rely on the summary herein.  Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures.

(c)     Qualification of Bids and Potential Bidders.  In order to participate in the sale process and to have a proposal considered by the Debtor, each Potential Bidder must deliver a written, irrevocable proposal for a Transaction that otherwise satisfies the below criteria.  A "Qualified Bidder" is a Potential Bidder that delivers a binding Bid (as defined below) that in the Debtor's discretion, satisfies the following (a "Qualified Bid"):

     i.    Bid Deadline.  Each Bid Package (as defined below) must be delivered in written form to counsel Bronson Law Offices P.C., 480 Mamaroneck Ave., Harrison, New York 10528, Attn:  H. Bruce Bronson, **so as to actually be received no later than 4:00 p.m. (prevailing Eastern Time) on the Bid Deadline of October 9, 2020**.[4]

     ii.    Bid Package.  Each Bid must include (collectively, the "Bid Package"): (i) a written and signed irrevocable bid (a "Bid"), stating that the Potential Bidder offers to consummate a Transaction, together with a Purchase Agreement marked to show changes against the Stalking Horse APA, (y) confirming that the Bid is irrevocable until the later of (1) thirty (30) days following entry of the order (the "Sale Order") approving the Transaction or (2) closing with the Successful Auction Bid, and (z) stating that the Potential Bidder has had the opportunity to conduct due diligence prior to its Bid, does not require further due diligence and does not contain any contingencies in accordance with subparagraph (j) below. The Debtor shall, in consultation with Lender, determine whether any Bid is a Qualified Bid.

     iii.    Assets.  Each Bid must clearly identify the Assets that the Bidder is agreeing to purchase and/or assume.

     iv.    Assets Purchase Price.  Each Bid must clearly state the Purchase Price to be paid for the Assets.

     v.    Designation of Assigned Contracts and Leases and Adequate Assurance of Future Performance.  Each Bid and accompanying Purchase Agreement must contain a list of any and all contracts and leases of the Debtors that are to be assumed and assigned in connection with a Transaction ("Assigned Contracts"), and must also contain written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future

---

[4] The Bid Deadline may be delayed or the qualifications for Potential Bidders relaxed at the discretion of the Debtor in consultation with the Lender.  Receipt of the Bid Package by email shall be considered adequate delivery (with original copies, if any, received by the counsel to the Debtor).

performance for the benefit of the non-Debtor parties to the Assigned Contracts on the list.

vi.    <u>Minimum Bid</u>.  At a minimum, the Bid must have a Purchase Price that has a monetary value in cash or other cash equivalents equal to or greater than $1,268,300, representing the Stalking Horse Bid Purchase Price ($1,110,000), plus the maximum amount of the Expense Reimbursement ($75,000), plus the Break-Up Fee ($33,300) plus a minimum overbid of $50,000.

vii.    <u>Financial Information</u>.  The Bid Package must contain such financial and other information that will allow the Debtor to make a determination, in consultation with Lender, as to each Potential Bidder's financial and other capabilities to consummate the Transaction contemplated by such Bid, including any proposed conditions to Closing.  The Purchase Price shall be payable in cash or cash equivalents at Closing and not be subject to any financing contingency.

viii.    <u>Bidding Protections</u>.  A Bid proposal other than the Stalking Horse Bid must not request or entitle the Potential Bidder to any termination fee, transaction or break-up fee, expense reimbursement, or similar type of payment.

ix.    <u>Identity of Bidders</u>.  Each Potential Bidder must fully disclose the identity of each entity that will be part of the proposed Transaction, as well as disclose the organization, form and the business conducted by each entity and what, if any, connection the Potential Bidder has with the Debtors.  Potential Bidders shall be required to provide such additional information as the Debtor may require regarding the Potential Bidder's ability to satisfy the terms of the Bid proposal.

x.    <u>Due Diligence; Contingencies</u>.  Except for any required regulatory approvals, if any, a Bid must not contain any contingencies of any kind, including, among others, obtaining (i) financing; (ii) shareholder, board of directors or other approvals; (iii) third party consents, acknowledgements or understandings of any king (including consents of counterparties to altered terms of any Assumed Contract) or (iv) the outcome or completion of due diligence. Each Potential Bidder must also affirmatively acknowledge that the Potential Bidder (a) had an opportunity to conduct due diligence regarding the Assets prior to making its Bid and does not require further due diligence, (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid, and (c) did not rely

upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied, by operation of law, or otherwise, regarding the Assets, or the completeness of any information provided in connection therewith except as expressly stated in these Bidding Procedures.

xi. <u>Consents</u>. Each Potential Bidder must represent that it obtained all necessary organizational approvals to make its Bid and to enter into the Purchase Agreement, as applicable.

xii. <u>Deposit(s)</u>. A Potential Bidder (other than the Stalking Horse Bidder, which has provided a ten percent (10%) deposit of the proposed purchase price) must deposit with the Debtor's counsel not less than the greater of (a) ten percent (10%) of the purchase price set forth in the Bid, in the form of a certified check or wire transfer on or before the Bid Deadline (the "<u>Deposit</u>"). The Deposit shall not become property of the Debtor's estate, absent further order of the Bankruptcy Court. The Deposit(s) shall be returned to each Potential Bidder (i) as soon as practicable if the Potential Bidder is not determined to be a Qualified Bidder or (ii) no later than five (5) business days after entry of the Sale Order, if the bidder is a Qualified Bidder (who has not otherwise forfeited its Deposit), but is not the Successful Bidder or the Backup Bidder. The Debtor's counsel will maintain any Deposit(s) in a non-interest-bearing escrow account.

xiii. "<u>As Is, Where Is</u>". Any Bid proposal must provide that any conveyance of the Assets will be on an "as is, where is" basis and without representations or warranties of any kind, except any representations and warranties of the Potential Bidder. Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its Bid and that it has relied solely upon its own independent review and investigation in making its Bid.

xiv. <u>Closing; Possession of Assets</u>. Any Bid proposal must state that the Bidder is prepared to close by the Closing Deadline, which is not later than October 29, 2020, and if the Bid is premised on removal of tangible assets from Debtor's leased real property, such assets shall be removed by November 15, 2020.

xv. <u>Debtor's Considerations</u>. The Debtor shall have the right, in consultation with the Lender, to determine that a Bid is not a Qualified Bid and shall notify bidders whether their respective Bid has been determined to be a Qualified Bid prior to the October 12,

2020 deadline to file a notice setting forth the selection of highest and best Bid.

xvi. In addition to the requirements above, the Debtor may request any additional information from any Potential Bidder to assist the Debtor in making a determination as to whether a Bid is a Qualified Bid.

(d) Sale to Stalking Horse Bidder. The Stalking Horse APA shall be deemed a Qualified Bid, and the Stalking Horse Bidder shall be deemed a Qualified Bidder. If no Qualified Bid other than Stalking Horse Bidder's is submitted by the Bid Deadline, the Debtor shall not hold the Auction, but may proceed with the Sale Hearing and seek approval of the Stalking Horse APA and the transactions contemplated thereby.

(e) Auction. If one or more Qualified Bids are received that are higher and better than the Stalking Horse Bid, and the Debtor determines, in consultation with Lender, after review of the Qualified Bids that an Auction process is in the best interests of the Debtor's estate and its creditors, the Debtor may, but shall not be required to, conduct an Auction with respect to the Assets. Debtor shall provide copies of all Qualified Bids to the Stalking Horse Bidder at least 24 hours in advance of the start of any Auction. If an Auction is conducted, it will take place at the offices of Bronson Law Offices P.C., 480 Mamaroneck Ave., Harrison, NY, on **October 11, 2020, starting at 10:00 a.m. (prevailing Eastern Time**), or at such other date and time or other place, as may be determined by the Debtor, in consultation with Lender, at or prior to the Auction. The Debtor reserves the right, in consultation with Lender, to hold the Auction remotely by Zoom or such other electronic platform. The Auction shall be conducted in accordance with the following procedures (as set forth in Section I of the Bidding Procedures).

i. Successful Auction Bid. The Auction shall continue until there is only one Bid for the Assets, which the Debtor determines, in consultation with Lender and subject to Bankruptcy Court approval, is the highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "Successful Auction Bid") and the Debtor announces that the Auction is closed. The Qualified Bidder submitting such Successful Auction Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of the buyer, as set forth in the applicable Purchase Agreement. Within one (1) business day after the conclusion of the Auction (but in any event prior to the Sale Hearing), the Successful Bidder shall (i) complete, execute and deliver to the Debtor the Purchase Agreement (as updated to conform to the Successful Auction Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Successful Auction Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent

necessary, such Deposit equals ten percent (10%) of the cash component of the Successful Auction Bid.

ii. <u>Backup Auction Bid</u>. At the conclusion of the Auction, the Debtor will also announce the second highest or otherwise best bid from among the Qualified Bids submitted at the Auction (the "<u>Backup Auction Bid</u>"). The Qualified Bidder submitting such Backup Auction Bid shall become the "<u>Backup Bidder</u>", and subject to the rights of the Successful Bidder, shall have such rights and responsibilities as set forth in the Purchase Agreement. Within one (1) business day after the conclusion of the Auction (but in any event prior to the commencement of the Sale Hearing), the Backup Bidder shall (i) complete, execute and deliver to the Debtor the Purchase Agreement (as updated to conform to the Backup Auction Bid) and all contracts, instruments or other documents evidencing and containing the terms and conditions upon which the Backup Auction Bid was made, and (ii) supplement its Deposit by wire transfer or other immediately available funds so that, to the extent necessary, such Deposit equals ten percent (10%) of the cash component of the Backup Auction Bid.

The Backup Auction Bid shall remain open and irrevocable until the earlier of (x) written notification to the Backup Bidder based on the Backup Auction Bid within ten (10) days following entry of the Sale Order that the Debtor has terminated the Transaction with the Successful Bidder and intends to proceed toward closing with the Backup Bidder based on the Backup Auction Bid in accordance with the terms of the Bidding Procedures, and (y) Closing of the Transaction with the Successful Bidder.

For the avoidance of doubt, notification to the Backup Bidder within such period that the Debtor has terminated a transaction with the Successful Bidder and that the Debtor intends to proceed toward closing with the Backup Bidder based on the Backup Auction Bid shall automatically extend the irrevocable nature of the Backup Auction Bid in accordance with the terms of such Backup Auction Bid. For the further avoidance of doubt, it is not necessary that the Backup Auction Bid actually close within such period.

iii. <u>Extensions/Adjournment.</u> The Debtor reserves its rights, in consultation with Lender to modify any provisions of the Bidding Procedures at or prior to the Auction, including, without limitation, extending the deadlines set forth in the Auction procedures, modifying bidding increments, adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice with all such modifications or adjournments

consistent with the terms of the Stalking Horse APA and the deadlines contained therein.

**D.**     **Bidding Protections**

22.     The proposed Stalking Horse APA contemplates the payment of bidding protections in the form of the Break-Up Fee and Expense Reimbursement in certain circumstances. The Debtor requests the Court grant the proposed Bid Protections administrative expense superpriority pursuant to section 503(b) and 507(b) of the Bankruptcy Code *pari passu* to any adequate protection claims of the Lender, which shall be payable solely from the proceeds of an Alternative Transaction.

23.     The Debtor submits that (a) approval of the Bid Protections is an integral part of the Stalking Horse APA and (b) the Bid Protections are reasonable in relation to the Stalking Horse Bidder's efforts and the amount of consideration contemplated by the Stalking Horse APA.

24.     The efforts of the Stalking Horse Bidder have increased the chances that the Debtor will receive the highest or otherwise best offer for the Assets by establishing a minimum bid for other bidders, subjecting the Debtor's assets to an open auction, and serving as a catalyst for other potential or actual bidders. Thus, the Bid Protections benefit the Debtor, its estate, creditors, and all other parties in interest.

25.     As stated above, the Stalking Horse Bidder is unwilling to commit to hold open its offer to purchase the Assets under the terms of the Stalking Horse APA unless the Bid Protections are approved. Accordingly, the Debtor requests that the Court approve the Bid Protections, as contemplated under the Stalking Horse APA.

**E.**     **Notice of Sale, Auction and Bidding Procedures**

26.     In accordance with Bankruptcy Rules 6004(a) and (c) and 2002(a)(2), the Debtor, through its counsel, will serve a copy of the Bidding Procedures Order by email and first class mail,

postage prepaid, to interested persons and entities, including: (i) the Debtor's secured creditors or their counsel; (ii) the Office of the United States Trustee for the Southern District of New York; (iii) all parties in interest who requested notice pursuant to Bankruptcy Rule 2002; (iv) all counterparties to any potential Assigned Contracts; (v) all parties who are known to assert a Lien on the Assets; (vi) all parties identified by the Debtor as potentially having an interest in acquiring the Assets; and (vii) all creditors or the Debtor who are listed on the Debtor's Schedules of Assets and Liabilities or who filed proofs of claim against the Debtor's estate (collectively, the "Notice Parties").

27.     At the conclusion of the Auction, in consultation with Lender and subject to Court approval, the Debtor will determine the highest or best offer for the Assets. The Debtor will file a notice with the Court, informing the Court of the Successful Bidder and Backup Bidder, if any.

28.     The Sale Hearing is scheduled for **October 14, 2020 at 10:00 a.m. (EST)**.

**F.      Assignment Procedures**

29.     The Stalking Horse APA contemplates that, subject to approval of the Court, certain of the Debtor's executory contracts and unexpired leases in relation to the operation of the Debtor's business may be assumed and assigned to the Purchaser, to the extent assignable under applicable law and in accordance with section 365 of the Bankruptcy Code. At Closing, the Purchaser will assume and thereafter in due course perform all of the obligations under the Assigned Contracts, if any, pursuant to section 365 of the Bankruptcy Code.

30.     The Debtor proposes that a schedule of contracts and leases proposed to be assumed and assigned, if any, together with the proposed corresponding Cure Amounts (the "Assumption Schedule") be filed by the Debtor with the Court not later than **October 6, 2020**, with notice thereof served upon all counterparties to the proposed Assigned Contracts.

31.     The Debtor may, with the consent of the Purchaser or Successful Bidder, add and remove executory contracts or unexpired leases from the Assumption Schedule until the Sale Hearing.  The Debtor will file and serve notice of any such amendment (an "Amendment Notice") on all non-Debtor parties to the Assigned Contracts that are impacted by any amendment to the Assumption Schedule.

32.     To facilitate a prompt resolution of disputes relating to the Cure Amounts and any other objections, the Debtor proposes that all non-Debtor parties to the Assigned Contracts will have until October 9, 2020 to file an objection (an "Assumption Objection") to the assumption and assignment of the Assigned Contracts to which they are parties, or to the Cure Amounts listed for those Assigned Contracts. Any party filing an Assumption Objection must state with specificity the basis of the objection and asserted Cure Amount and must include appropriate documentation in support thereof.

33.     If an Assumption Objection is timely filed and not consensually resolved, the Debtor proposes that the Court may hold a hearing with respect to the Assumption Objection either at the Sale Hearing or at such other date as the Court shall designate. The Debtor proposes that if the Assumption Objection relates only to the Cure Amount of an Assigned Contract, that Assigned Contract may be assumed by the Debtor and assigned to the Purchaser or Successful Bidder; provided, however, that the amount asserted by the objecting party as the proper Cure Amount, or a different amount set by the Court, shall be held in escrow pending further order of this Court or mutual agreement of the parties as to the proper Cure Amount for that Assigned Contract. The Debtor proposes that the Purchaser or Successful Bidder be authorized to settle, compromise or otherwise resolve any disputed Cure Amounts with the relevant non-Debtor party to any Assigned Contract without Court approval or notice to any party.

34.     The Debtor proposes that if no Assumption Objection is timely filed and served, then subject to entry of an Order by this Court, the Cure Amounts set forth in the Assumption Schedule shall control notwithstanding any terms or conditions to the contrary in any Assigned Contract. The non-Debtor parties to the Assigned Contracts shall be barred from asserting against the Debtor or the Successful Bidder any other claim arising from the Assigned Contracts.

35.     The effective date of any assumption and assignment of the Assigned Contracts shall be the date on which the Transaction closes. Any Cure Amounts to be paid under any of the Assigned Contracts shall be paid by the Debtor or Successful Bidder either prior to, upon or promptly following the closing of the Transaction, or as otherwise agreed to by the parties to the Assigned Contracts.

## BASIS FOR RELIEF REQUESTED

36.     By this Sale Motion, the Debtor requests authority, pursuant to section 363 of the Bankruptcy Code, to sell the estate's interest in the Assets, free and clear of all Liens pursuant to the Bidding Procedures.

### A.     The Sale of the Assets Should be Approved

37.     Section 363(b) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Although section 363 does not set forth a standard for determining when it is appropriate for a court to authorize the sale or disposition of a debtor's assets, the United States Court of Appeals for the Second Circuit, in applying this provision, has required that it be based upon the sound business judgment of the Debtor. *See Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 466 (2d Cir. 2007); *Official Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp. (In re Chateaugay*

*Corp.)*, 973 F.2d 141, 145 (2d Cir. 1993); *Parker v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, 430 B.R. 65, 83 (S.D.N.Y. 2010) ("The overriding consideration for approval of a Section 363 sale is whether a 'good business reason' has been articulated.") (citations omitted).

38. In addition to requiring sound business reasons to approve a sale pursuant to section 363(b) of the Bankruptcy Code, many courts have required a showing that the price to be obtained for assets be fair and reasonable; that the sale to the proposed Purchaser was negotiated in good faith; and that it does not unfairly benefit insiders, the Purchaser, or a certain creditor or class of creditors. *See, e.g., In re Channel One Communications*, 117 B.R. at 494-97, *In re Indus. Valley Refrig. & Air Cond. Supplies, Inc.*, 77 B.R. 15 (Bankr. E.D. Pa. 1987).

39. In *In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983), one of the seminal and most widely followed cases dealing with asset sales, the Second Circuit held that the factors to be considered in determining whether a sound business reason exists include the following:

> the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, *most importantly perhaps, whether the asset is increasing or decreasing in value.*

*Id*. at 1071 (emphasis supplied); *see also In re the Delaware & Hudson Ry. Co.,* 124 B.R. 169 (D. Del. 1991); *In re Eng'g Prod. Co.,* 121 B.R. 246 (Bankr. E.D. Wis. 1990); *In re Thomson McKinnon Sec., Inc.*, 120 B.R. 301 (Bankr. S.D.N.Y. 1990); *In re Channel One Communications, Inc.*, 117 B.R. 493 (Bankr. E.D. Mo. 1990); *In re Brethren Care*, 98 B.R. 927 (Bankr. N.D. Ind. 1989).

40. Application of the above standards demonstrates that approval of the Stalking Horse APA is warranted. The Debtor is exercising sound business judgment by conducting the

sale process through a stalking horse bidder who will have established a minimum bid, subjecting the Assets to an open auction and serving as a catalyst for other potential or actual bidders. The Debtor, in consultation with its professionals, has determined that the proposed Bidding Procedures will ensure the highest and best offer is received for the Assets.

41.     The Debtor believes the Bidding Procedures will ensure that all interested parties have the opportunity to bid on the Assets, and the Debtor's estate will thereby benefit by securing the highest and best value.

42.     The Debtor has marketed the Assets for over a year and the Broker has marketed the Assets intensely for the last five (5) months. The Broker has worked with a number of interested parties to complete a potential sale, but for various reasons those other parties declined to submit offers higher and better than the terms set forth in Stalking Horse APA. The Debtor believes that the Purchase Price is fair and reasonable for a stalking horse bid under the circumstances. There is also some urgency to disposing of the Assets expeditiously including the Debtor's closure, the global pandemic, the accrual and inability to pay rent, and lack of funds to continue the business generally. If the Debtor does not move forward with this sale, it will have no choice but to abandon the Assets, which would then be sold by the Lender in a foreclosure process, that is sure to net even less money than the Stalking Horse is offering.

43.     Many courts require that "fair and accurate notice" be given of the proposed sale under section 363(b) of the Bankruptcy Code. *See, e.g., In re Delaware & Hudson Ry.*, 124 B.R. 169, 176 (D. Del. 1991); *Channel One,* 117 B.R. at 496 (Bankr. E.D. Mo. 1990); *Naron & Wagner, Chartered*, 88 B.R. 85, 88 (Bankr. D.Md. 1988). Fair and accurate notice should inform all interested parties of the liquidation of the debtor's business; disclose accurately the terms of the sale; explain the effect of the sale upon the debtor's business; and explain why the sale is in the

best interests of the debtor's estate. *Delaware & Hudson*, 124 B.R. at 180; *see also, Naron & Wagner*, 88 B.R. at 88.

44.     The Debtor believes that there will be sufficient notice of the Bidding Procedures as proposed herein in order to encourage active participation by interested parties and to achieve the highest and best value through the sale process.

45.     For these reasons, the Debtor respectfully requests that it be authorized to proceed with the sale process in accordance with the Bidding Procedures.

**B.      The Assets Should be Sold Free and Clear of Liens, Claims, Encumbrances and Interests**

46.     The Debtor seeks approval of the sale of the Assets free and clear of all Liens other than permitted encumbrances, if any.

47.     Property may be sold outside the ordinary course of business under section 363(b) of the Bankruptcy Code, free and clear of all liens, claims and encumbrances under Bankruptcy Code section 363(f), only if:

> 1.     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> 2.     such entity consents;
>
> 3.     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> 4.     such interest is in bona fide dispute; or
>
> 5.     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

48.     Accordingly, a debtor may sell property of a bankruptcy estate outside the ordinary court of business if one of the five conditions under section 363(f) of the Bankruptcy Code is

satisfied. *See In re Grubb & Ellis Co*., Case No. 12-10685 (MG), 2012 Bankr. LEXIS 1279, at \*31 (Bankr. S.D.N.Y. Mar. 27, 2012) (discussing section 363(f)) of the Bankruptcy Code); *In re Borders Group, Inc.*, 453 B.R. 477, 483–84 (Bankr. S.D.N.Y. 2011) (same).

49.     Here, all parties holding Liens on the Assets will be provided notice of the proposed Transaction and shall be granted an opportunity to object to the relief requested in the instant Sale Motion, and any such entity that does not object to the sale shall be deemed to have consented. *See, e.g., Futuresource LLC v. Reuters, Ltd*., 312 F.3d 281, 285-86 (7th Cir. 2002) (standing for the proposition that the lack of an objection to a proposed sale of assets counts as consent); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. 343, 345 (Bankr. E.D. Pa. 1988) (citing *In re Gabel*, 61 B.R. 661 (Bankr. W.D. La. 1985)); *see also In re Enron Corp*., 2003 WL 21755006 at \*2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under section 363(f)(2)). Therefore, if a party holding a Lien on the Assets who received the Sale Notice fails to object, the Debtor's sale of the Assets free and clear of all Liens satisfies section 363(f)(2) of the Bankruptcy Code.

50.     Moreover, if any lienholder does not consent, the proposed sale free and clear of its liens is nevertheless permitted under section 363(f)(3) of the Bankruptcy Code because the price at which the Assets are to be sold is greater than the aggregate value of all liens on such property, as determined by the full and fair sale process proposed herein. Courts in this District have held that such value is determined not by the face amount of the liens, but rather "the amount by which the lienholder[s'] claim[s] [are] actually secured." *In re Bos. Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus. Corp*., 63 B.R. 474, 476 (Bankr. S.D.N.Y. 1986)

("363(f)(3) is to be interpreted to mean what it says: the price must be equal to or greater than the aggregate value of the liens asserted against it, not their amount."). The amount by which the liens are secured is defined by reference to section 506(a) of the Bankruptcy Code as the value of the collateral securing the claims. *In re Bos. Generating*, 440 B.R. at 332; *see also United Sav. Ass'n of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 372, (1988) ("The phrase value of such creditor's interest in § 506(a) means the value of the collateral.") (internal quotations and citations omitted). Here, the best evidence of this value is the Purchase Price offered by the Stalking Horse Bidder or to be offered by a Successful Bidder at Auction after the sale process proposed herein, which the Debtor submits is a full and competitive marketing and sale process that will fairly reflect the value of the property sold. If the sale proceeds resulting from such process are insufficient to pay a lien, such lien is not secured, rendering such lien valueless and satisfying section 363(f)(3). *See In re Bos. Generating*, 440 B.R. at 332 ("[T]he proceeds of the Transaction may be insufficient to pay the First Lien Debt in full; if that is the case, then the Second Lien Lenders' claims are not secured. Under *Beker* and the many decisions of other Bankruptcy Courts following its reasoning, I find that section 363(f)(3) is satisfied."); *see also In re Oneida Lake Dev., Inc.*, 114 B.R. 352, 357 (Bankr. N.D.N.Y. 1990) (noting *Beker* requires "the Court must conclude that the proposed sale price is the best price obtainable under the circumstances."). As this Court has recognized, "to hold otherwise would effectively mean that most section 363 sales of encumbered assets could no longer occur either (a) absent consent of all lienholders (including those demonstrably out of the money) or (b) unless the proceeds of the proposed sale were sufficient to pay the face amount of all secured claims in full." *In re Bos. Generating,* 440 B.R. at 332. To the extent required, "special circumstances" additionally justify this result, including the declining value of the Assets due to the global pandemic, closure of the Debtor's business, and the

Debtor's financial inability to maintain the Premises and pay accruing taxes and insurance costs. *See In re Oneida*, 114 B.R. at 357 ("[T]the apparent rapid depreciation of the property provide special circumstances which suggest that the Debtor has met the requirements of Code § 363(f)(3)."). Accordingly, the Debtor submits the value obtained through the sale process is the best value obtainable for creditors and greater than the aggregate value of the liens for purposes of satisfying section 363(f)(3).

51. Finally, Bankruptcy Code section 363(f)(5) is also satisfied. As this Court has held, the existence of state law foreclosure procedures and enforcement actions satisfy section 363(f)(5) in that they constitute legal or equitable proceedings compelling lienholders to accept money satisfaction of their interests. *See In re Bos. Generating, LLC*, 440 B.R. 302, 333 (Bankr. S.D.N.Y. 2010) ("Numerous legal and equitable procedures exist by which the Second Lien Lenders could be forced to accept less than full payment of the Second Lien Debt. Thus, the Court finds that because the Second Lien Lenders could be compelled under state law to accept general unsecured claims to the extent the sale proceeds are not sufficient to pay their claims in full, section 363(f)(5) is satisfied.").

C. **The Stalking Horse Bidder or Successful Bidder Shall Be Entitled To Section 363(m) Protection**

52. Section 363(m) of the Bankruptcy Code protects good faith purchasers at sales conducted under section 363(b) by providing that:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

53.    Although the Bankruptcy Code does not define good faith, the United States Court of Appeals for the Second Circuit has provided the following definition of good faith in the context of sales under section 363 of the Bankruptcy Code:

> Good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made. A purchaser's good faith is lost by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders…. As just defined, the good-faith analysis is focused on the purchaser's conduct in the course of the bankruptcy proceedings.

Licensing by *Paolo v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d Cir. 1997) (quotations and citations omitted); *see In re Motors Liquidation*, 430 B.R. at 78 (relying on *Gucci* definition of good faith in this context).

54.    The Debtor is selling the Assets to the Stalking Horse Bidder, subject to higher or better offers, through a sealed bid process with the right to conduct an open bid auction after interested parties receive notice and are given an opportunity to participate. The Assets have been and will continue to be extensively marketed by the Broker. The Debtor will seek the Court's approval of the Transaction to the Stalking Horse Bidder or Successful Bidder, as applicable. The Debtor submits that the sales process will be an arm's length process and that the Stalking Horse Bidder or Successful Bidder will be a good faith purchaser of the Assets.

55.    Accordingly, the Debtor respectfully requests that the Stalking Horse Bidder or Successful Bidder be afforded the protections under section 363(m) of the Bankruptcy Code.

### D.    Bid Protections are Warranted

56.    The Debtor proposes that if overbidding occurs at the Auction, the Stalking Horse Bidder shall have the right, but not the obligation, to participate in the overbidding subject only to the limitations provided by the Bidding Procedures. However, to compensate the Stalking Horse Bidder for serving as a "stalking horse," thereby subjecting its bid to better or higher offers, the

Debtor and the Stalking Horse Bidder seek authority for the Debtor to pay the Stalking Horse Bidder the Bid Protections if an Alternative Transaction is consummated. The Debtor and the Stalking Horse Bidder believe that the proposed Bid Protections are (a) fair and reasonable, given the benefits to the estate of having a definitive Stalking Horse APA and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted and (b) necessary to preserve the value of the Debtor's estate.

57. Bidding incentives such as the Bid Protections encourage a potential purchaser to invest the requisite time, money, and effort to conduct due diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the chapter 11 process. *See e.g., In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding bidding incentives may be "legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); *In re Marrose Corp.*, 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) ("Agreements to provide breakup fees or reimbursement of fees and expenses are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers").

58. The Debtor submits that bidding protections such as the Bid Protections are a normal and necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code. *See e.g., In re Kmart*, Case No. 02 B02474 (SPS) (Bankr. N.D. Ill. May 10, 2002) (authorizing a termination fee and bid protections for potential bidders); *In re Comdisco, Inc.*, Case No. 01 24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate, and a necessary inducement for, and a condition to, the proposed Purchaser's entry into the Asset Stalking Horse APA); *In re Integrated Resources, Inc.*,

147 B.R. at 660 (noting that break-up fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs, and the risks such bidder faces by having its offer held open, subject to higher and better offers); *In re Crowthers McCall Pattern, Inc.*, 114 B.R. 877 (Bankr. S.D.N.Y. 1990) (approving an overbid requirement in an amount equal to the approved break-up fee); *In re Kupp Acquisition Corp.*, Case No. 96 1223 (PJW) (Bankr. D. Del. March 3, 1997).

59.     Here, the proposed Bid Protections are limited to (a) the Expense Reimbursement, entitling the Stalking Horse Bidder to be reimbursed for amounts it actually incurred, not to exceed $75,000, and (b) the Break-Up Fee of three percent (3%) of the purchase price. These amounts have been reasonably calculated to compensate the Stalking Horse Bidder for (a) committing the time to perform due diligence, (b) lost opportunity in being bound to a transaction that could be topped in a competitive auction process and (c) serving as a "stalking horse" to encourage the submission of other bids. Accordingly, the Debtor believes that the Bid Protections should be approved.

### E.     The Assignment Procedures and the Assumption and Assignment of the Assigned Contracts Pursuant Thereto Are Appropriate and Should be Approved

60.     Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). In addition, under section 365(b)(1) of the Bankruptcy Code, for a trustee to assume an executory contract or unexpired lease, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1). Once the contract or lease is

assumed, the trustee may assign it, "only if . . . adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).

61.     The standard for approval of assumption or rejection is whether the decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts to authorize the rejection of an executory contract is that of "business judgment"); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1098 (2d Cir. 1993); *In re Stable Mews Assoc., Inc.*, 4l B,R. 594, 596 (Bankr. S.D.N.Y. 1984). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but may be provided, among other means, by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding adequate assurance present when assignee has financial resources and expressed willingness to devote sufficient funding to business); *see also In re Nqtco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

62.     The Debtor submits that the proposed Assignment Procedures are appropriate and reasonably tailored to provide the non-Debtor contract counterparties with adequate notice of the proposed assumption and assignment of the applicable Assigned Contracts, as well as proposed Cure Amounts, if applicable.  The Assignment Procedures provide such contract parties with an opportunity to object and to be heard with respect to any proposed assumption and assignment and the related proposed Cure Amounts.  The Assignment Procedures provide that, in the event an objection of a counterparty is not consensually resolved, the Court will determine disputed issues,

including any adequate assurance of future performance issues. Thus, the Debtor submits that the Assignment Procedures comport with the requirements of section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, and should be approved.

63.     The assumption and assignment to the Purchaser or Successful Bidder of the Assigned Contracts pursuant to the Assignment Procedures and Bidding Procedures comport with the requirements of section 365 of the Bankruptcy Code and should be approved. As set forth in the Stalking Horse APA, to the extent any defaults exist under any Assigned Contracts, such defaults are required to be cured, and the Purchaser is required to assume future obligations under the Assigned Contracts. In accordance with the Bidding Procedures, any Qualified Bid must include written documentation sufficient to demonstrate the Potential Bidder's ability to provide adequate assurance of future performance. In addition, to the extent necessary, the Debtor will present facts at the Sale Hearing to show the financial wherewithal, willingness, and ability of the Purchaser or Successful Bidder to perform under the Assigned Contracts. Because the Sale Hearing will provide the Court with an opportunity to evaluate the ability of the Purchaser or Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, the Debtor submits that the Court should authorize the assumption and assignment of the Assigned Contracts, effective upon the Closing of the proposed Transaction.

**F.     Waiver of Stay**

64.     Under Bankruptcy Rule 6004(h), orders authorizing the sale of a debtor's assets under section 363(b) of the Bankruptcy Code are "stayed until the expiration of 14 days after entry of the order" authorizing such sale. Fed. R. Bankr. P. 6004(h).

65.     A waiver of the stay requirement under Bankruptcy Rule 6004(h) will relieve the Debtor's estate of any financial burdens associated with the Assets and reduce the expenditure of

additional funds to maintain the Assets. Additionally, such a stay could further delay the date that a new owner can take possession and control of the Assets and thus could chill the sale. Conversely, the waiver of the stay will allow for a smoother transition for the new owner and unburden the Debtor and the estate from any obligations arising from the Assets.

66.     For these reasons, the Debtor respectfully requests that the Court waive the requirement under Bankruptcy Rule 6004(h).

### NOTICE

67.     Bankruptcy Rule 2002(a) requires that notice of motions under Bankruptcy Code section 363(b) be given to "the debtor, the trustee, all creditors and indenture trustees…" Fed. R. Bankr. P. 2002(a). Bankruptcy Rule 2002(c)(1) directs that notices of proposed sales of property of the estate "shall include the time and place of any Auction, . . . and the time fixed for filing objections." Fed. R. Bankr. P. 2002(c)(1).

68.     The Debtor intends to serve notice of this Sale Motion on the Notice Parties.

### NO PRIOR RELIEF

69.     No previous application for the relief requested herein has been made to this or any other court.

*[concluded on the following page]*

**WHEREFORE**, the Debtor requests that the Court (i) enter the Bidding Procedures Order, in substantially the same form as that annexed hereto as <u>Exhibit A</u>; (ii) enter the Sale Order, in substantially the same form as that annexed hereto as <u>Exhibit B</u>; and (iii) grant such other and further relief as this Court deems just and proper.


Dated: September 24, 2020
Harrison, New York

**BRONSON LAW OFFICES, P.C**.


By: *  /s/H. Bruce Bronson*
        *H. Bruce Bronson*