
EXHIBIT C

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into this 24th day of September, 2020, by and between Edison Price Lighting, Inc., a New York corporation ("*Seller*") and Current Lighting Solutions, LLC, a Delaware limited liability company ("*Purchaser*").

## RECITALS:

WHEREAS, Seller is engaged in the business of the design, manufacture, distribution, and sale of lighting fixtures, including specification grade recessed, surface-mounted and track-mounted luminaires, track lighting systems, wall grazing systems, and optical accessories for museums, galleries, commercial, academic and residential customers (collectively, the "*Business*"); and

WHEREAS, on May 1, 2020 (the "*Initial Petition Date*"), Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "*Bankruptcy Code*"), in the United States Bankruptcy Court for the Southern District of New York, White Plains Division (the "*Bankruptcy Court*"), which case is being administered as Case No. 20-22614 (the "*Chapter 11 Case*");

WHEREAS, Seller continues in the possession and control of its assets and properties in accordance with §§ 1107 and 1108 of the Bankruptcy Code; and

WHEREAS, Seller desires to sell to Purchaser substantially all of its assets that are used in connection with the conduct of the Business pursuant to the terms and conditions of this Agreement, and Purchaser desires to so purchase and acquire such assets from Seller, in accordance with §§ 363 and 365 of the Bankruptcy Code.

## AGREEMENT:

NOW, THEREFORE, in consideration of the foregoing premises, the representations, warranties, covenants, and agreements contained herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

1.1     <u>Certain Definitions</u>. As used herein, the following terms shall have the following meanings:

"*Affiliate*" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such first Person where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through the ownership of voting securities, by contract, as trustee, executor or otherwise.

"*Alternative Transaction*" means any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition (including a liquidation) of all, or a material portion of, the Acquired Assets (excluding, in each foregoing case, the sale of inventory by Seller conducted in the ordinary course of business) to a purchaser or purchasers other than Purchaser or effecting any other transaction (including a chapter 11 plan) the consummation of which would be substantially inconsistent with the Transactions.

"*Ancillary Agreements*" means any certificate, agreement, document or other instrument to be executed and delivered in connection with this Agreement.

"*Avoidance Actions*" means all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including any preference or fraudulent conveyance claims).

"*Bankruptcy Petition*" means the voluntary bankruptcy petition filed by Seller with the Bankruptcy Court on the Initial Petition Date.

"*Bid Protections Order*" means an order of the Bankruptcy Court substantially in the form attached hereto as Exhibit A, reasonably acceptable to Purchaser, the Seller and the Lender, regarding certain bid protections in favor of Purchaser.

"*Books and Records*" means all books and records relating to the Acquired Assets, including but not limited to all such books of account, ledgers and general, financial and accounting records, machinery and equipment maintenance files, customer lists, customer purchasing histories, price lists, distribution lists, supplier lists, production data, quality control records and procedures, customer complaints and inquiry files, research and development files, records and data (including all correspondence with any Governmental Authorization), sales material and records (including pricing history, total sales, terms and conditions of sale, sales and pricing policies and practices), strategic plans, internal financial statements, marketing and promotional surveys, material and research, files relating to Intellectual Property, information technology system data, emails, product costing modules, accounts receivable and accounts payable documents, and production work flows; *provided* that Books and Records will not include any Seller Corporate Materials.

"*Break-Up Fee*" means an amount equal to three percent (3%) of the Purchase Price.

"*Business Day*" means any day on which commercial banking institutions are open for business in New York, New York.

"*Cash Collateral Order*" means that certain Final Order, entered by the Bankruptcy Court at docket no. 100, concerning the Seller's use of cash collateral.

"*Causes of Action*" means any and all causes of action, defenses, and counterclaims accruing to Seller or that is property of the Estate based upon facts, circumstances and transactions that occurred prior to the Closing Date, including any Avoidance Actions.

"*Claim*" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"*Contracts*" means all agreements, contracts, leases, consensual obligations, promises or undertakings, other than Employee Benefit Plans.

"*Cure Amounts*" means all amounts, costs and expenses required by the Bankruptcy Court to cure all defaults under the Assigned Leases so that they may be assumed and assigned to Purchaser pursuant to §§ 363 and 365 of the Bankruptcy Code.

"*Designated Entity*" means an entity that is an Affiliate of Purchaser, rather than Purchaser itself, that Purchaser may, at its option and upon notice to Seller, designate to be the assignee of some or any of the Acquired Assets.

"*Employee Benefit Plans*" means (i) all "employee benefit plans" (as defined in §3(3) of ERISA), including any employee pension benefit plans; (ii) all employment, consulting, non-competition, employee non-solicitation, employee loan or other compensation agreements, and (iii) all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, dependent care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, whether written or unwritten, qualified or unqualified, funded or unfunded and all underlying insurance policies, trusts and other funding vehicles, in each case currently maintained by or as to which Seller has or could reasonably be expected to have any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of Seller.

"*Equipment*" means all equipment, machinery, materials, tools, vehicles, IT systems, hardware and software, computers and servers, telephones, machinery, materials, implements, signage, office supplies and all other tangible personal property of every kind and description, including, but not limited to, the following: IBM Unix and Windows-based servers; Intrepid server and data; SolidWorks documents vault, material requirements planning system; shop-floor printers; Trumpf controls, computer numerical control and other machine controls; and BOM Creator.

"*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and regulations and formal guidance issued thereunder.

"*Estate*" means the estate of Seller created by § 541 of the Bankruptcy Code upon the filing of the Bankruptcy Petition.

"*Estate Causes of Action*" means any and all Causes of Action that are not Purchased Causes of Action. For the avoidance of doubt, "*Estate Causes of Action*" includes (A) all Avoidance Actions other than as expressly set forth in the definition of Purchased Causes of Action, and (B) all Causes of Action against any administrative or other agent, lender or secured party related to any credit facility existing at any time whether prior to or after the filing of the Bankruptcy Petition.

"*Expense Reimbursement*" shall mean an amount up to $75,000, determined based on Purchaser's actual expenses.

"*Final Order*" means an order of the Bankruptcy Court that has not been appealed, reversed, modified, amended or stayed and the time to appeal from or to seek review or rehearing of such order has expired.

"*GAAP*" means United States generally accepted accounting principles, as in effect from time to time.

"*Governmental Authorization*" means any consent, franchise, license, registration, permit, order or approval issued, granted, given or otherwise made available by or under the authority of any Governmental Body or pursuant to any Law, including, as the context may require, any declarations or filings with, or expiration of waiting periods imposed by, any such Governmental Body.

"*Governmental Body*" means any (i) nation, state, county, city, town, borough, village, district or other jurisdiction, (ii) federal, state, local, municipal, foreign or other government, (iii) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers), (iv) multinational organization or body, (v) body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power, or (vi) official of any of the foregoing.

"*Intellectual Property*" means all trademarks, trade names, corporate names, company names, business names, product or brand names, service marks, patents, copyrights (including moral rights), and any applications for or registrations of any of the foregoing, works of authorship, know-how, logos, proprietary information, protocols, schematics, specifications, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, domain names, web sites, works of authorship and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing such as instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries) inventions, trade secrets, designs, manufacture and assembly instructions, and any other intellectual property or intangible property that are used in the Business as presently conducted and any rights relating to any of the foregoing.

"*Interest*" means any Lien or Claim to the extent such Lien or Claim constitutes an "interest" under § 363(f) of the Bankruptcy Code.

"*Law*" means any applicable federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

"*Leased Premises*" means 41 10 22nd Street, Long Island City, NY 11101.

"*Lender*" means Citibank, N.A., in its capacity as pre-petition lender and secured creditor of Seller.

"*Liability*" means any and all obligations, liabilities, debts and commitments, whether known or unknown, asserted or unasserted, fixed, absolute or contingent, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, due or to become due, whenever

or however arising (including whether arising out of any contract or tort based on negligence, strict liability, or otherwise) and whether or not the same would be required by GAAP to be reflected as a liability in financial statements or disclosed in the notes thereto.

"*Lien*" means any mortgage, deed of trust, lien, pledge, charge, title, defect, security interest, pledge, leasehold interest or other legal or equitable encumbrance of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or nonmaterial, known or unknown.

"*Material Adverse Change*" means only such change, circumstance, or effect as shall have arisen after the date on which this Agreement shall have been executed by Seller and prior to the Closing that has a materially adverse effect on (i) the operations, assets, properties or condition (financial or otherwise) of the Business or the Acquired Assets taken as a whole, or (ii) the ability of any of the parties hereto to consummate the Transactions *provided, however*, that "Material Adverse Change" shall not include any event, occurrence, fact, condition or change, directly or indirectly, arising out of or attributable to: (a) general economic or political conditions; (b) conditions generally affecting the industries in which the Business operates; (c) any changes in financial, banking or securities markets in general; (d) any action required or permitted by this Agreement; (e) any matter of which Purchaser is aware on the date hereof; (f) any changes in applicable Laws or accounting rules (including GAAP) or the enforcement, implementation or interpretation thereof; (g) the announcement, pendency or completion of the transactions contemplated by this Agreement, including losses or threatened losses of employees, customers, suppliers, distributors or others having relationships with the Seller and the Business; or (h) acts of God (including earthquakes, storms, severe weather, fires, floods and natural catastrophes), hostilities, acts of war, sabotage or terrorism or military actions, or the Covid-19 pandemic, or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions; *provided, further*, such exclusions apply solely to the extent that such event, occurrence, fact, condition, or change does not have a materially disproportionate impact on Seller as compared to other participants in the industry.

"*Person*" means any individual, corporation, partnership, joint venture, trust, association, limited liability company, unincorporated organization, other entity, or governmental body or subdivision, agency, commission or authority thereof.

"*Purchased Causes of Action*" means (i) Causes of Action arising from breaches of warranty relating to the Acquired Assets, (ii) Avoidance Actions against Purchaser or its Related Persons (including any Transferred Employees, other than any Avoidance Actions against Transferred Employees who were officers or directors of Seller and who were "insiders" of Seller within the meaning of Section 101(31) of the Bankruptcy Code), and (iii) other Causes of Action against Purchaser or its Related Persons (including any Transferred Employees, other than any Avoidance Actions against Transferred Employees who were officers or directors of Seller and who were "insiders" of Seller within the meaning of Section 101(31) of the Bankruptcy Code).

"*Related Person*" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, financial advisors, restructuring advisors, attorneys, accountants, investment

bankers, Affiliates or representatives of (i) any such Person and (ii) of any Affiliate of such Person.

"*Sale Hearing*" means the hearing conducted by the Bankruptcy Court to approve the Transactions.

"*Seller Corporate Materials*" means all of Seller's corporate minute books and records of internal corporate proceedings, stock transfer ledgers, blank stock certificates, corporate seals, tax and accounting records, work papers and other records relating to the organization or maintenance of the legal existence of Seller.

"*Successful Bid*" shall have the meaning set forth in the Bid Protections Order.

"*Successful Bidder*" shall have the meaning set forth in the Bid Protections Order.

"*Tax*" or "*Taxes*" means any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, custom duties, capital stock, franchise, profits, withholding, social security (or similar excises), unemployment, disability, ad valorem, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not, by any governmental authority responsible for imposition of any such tax (domestic or foreign).

"*Transactions*" means the transactions contemplated by this Agreement and the Ancillary Agreements.

"*Trustee*" means any trustee or fiduciary appointed to act on behalf of Seller or as successor to Seller.

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1     Sale and Purchase of Acquired Assets. On the terms and subject to the conditions set forth in this Agreement, on the Closing Date, Purchaser (or the applicable Designated Entity) shall purchase from Seller, and Seller shall sell, assign, transfer, convey and deliver to Purchaser (or the applicable Designated Entity), all of Seller's right, title and interest in and to all Acquired Assets (as defined below) in existence on the Closing Date, free and clear of all Interests pursuant to and to the maximum extent permitted by §§ 363 and 365 of the Bankruptcy Code. As used herein, the term "*Acquired Assets*" means all assets, properties, rights, interests, benefits and privileges of whatever kind or nature, both tangible and intangible, real and personal wherever located, that are owned by Seller (except only for the Excluded Assets) to the extent that such assets, properties, rights, interests, benefits and privileges are transferable under applicable Law, the Bankruptcy Code or otherwise. Without limiting the generality of the foregoing, the term "Acquired Assets" shall include all of Seller's right, title and interest in and to the following (except to the extent any of the following are expressly included within the Excluded Assets):

(a)     the Equipment of Seller identified on Schedule 2.1(a), as such Schedule may be updated from time to time by Purchaser pursuant to Section 6.7, (the "*Assigned Equipment*"), and any leases relating to such Assigned Equipment (the "*Assigned Leases*");

(b)     all raw materials, work-in-process and finished good inventory of Seller;

(c)     deposits and other prepaid amounts that relate to the Acquired Assets;

(d)     all of Seller's rights in Purchased Causes of Action;

(e)     all of Seller's Books and Records; *provided* that Seller may obtain and retain copies of any or all such books and records before their transfer to Purchaser;

(f)     all Intellectual Property of Seller (to the extent assignable) and all goodwill of Seller;

(g)     all of Seller's Governmental Authorizations and all of Seller's pending applications therefor or renewals thereof, in each case solely to the extent transferable to Purchaser, and excluding Governmental Authorizations or pending applications therefor required for the continued operation of an Excluded Asset;

(h)     all of Seller's rights with respect to any confidentiality, noncompetition, non-solicitation or other similar obligations of any Person other than Seller (including any such obligations of any third party or of any current or former Related Person of Seller) that are owed to Seller or with respect to which Seller has the rights to enforce; and

(i)     all of Seller's other assets, properties and rights (unless specifically identified as an Excluded Asset).

2.2     Excluded Assets. The Acquired Assets do not include, and Seller will not transfer to Purchaser, any of the following assets of Seller (the "*Excluded Assets*"):

(a)     all accounts receivable of Seller;

(b)     the Equipment of Seller other than the Assigned Equipment;

(c)     all cash, bank deposits, securities and cash equivalents, including for this purpose all cash and cash equivalents, including ACH payments and uncleared checks and payments in transit received or initiated prior to the Closing Date;

(d)     all deposits and other prepaid amounts (including without limitation all such amounts held by Seller's advisors) other than those deposits and prepayments referenced in Section 2.1(c);

(e)     Seller's rights with respect to the bank accounts and lockbox arrangements relating to the Business, including, without limitation, the bank accounts and lockbox arrangements listed or described on Schedule 2.2(e);

(f)     other than the Assigned Leases, all Contracts to which Seller is a party, and all rights and deposits under such Contracts;

(g)     all Seller Corporate Materials;

(h)     all rights with respect to Employee Benefit Plans and all Contracts related thereto;

(i)     any books, records or other information related solely and exclusively to the other Excluded Assets;

(j)     all refunds, credits or deposits of Taxes of Seller with respect to the period prior to the Closing Date, including any refunds, credits or deposits of Taxes;

(k)     all Estate Causes of Action of Seller, including without limitation (A) all Avoidance Actions other than as otherwise expressly provided herein, and (B) all Causes of Action against any administrative or other agent, lender or secured party related to any credit facility existing at any time, whether prior to or after the filing of the Bankruptcy Petition;

(l)     the corporate franchise of Seller and any and all prepaid expenses and deposits in respect of franchise Taxes and the like;

(m)     all property, rights and assets relating to another Excluded Asset or arising from and relating to the defense, release, compromise, discharge or satisfaction of any of the Liabilities;

(n)     all documents, emails and other communications relating to the Transactions or any preparations or planning with respect thereto, including all such materials consisting of this Agreement, the Ancillary Agreements, memoranda, research, analysis, planning, due diligence reports, quality of earnings reports, agreements with financial advisors, investment bankers, accountants or legal counsel, whether or not subject to any attorney-client privilege, work product privilege, or any other privilege (the "*Transaction-Related Documents*"), and Seller's right to exercise or waive any attorney-client privilege, work product privilege or other privilege with respect to the Transactions or any of the Transaction-Related Documents;

(o)     all rights of Seller arising under this Agreement, the Ancillary Agreements, and under any other agreement between Seller and Purchaser entered into in connection with this Agreement;

(p)     all good faith or other bid deposits submitted by any third party;

(q)     all insurance policies of any of Seller for directors', managers', and officers' liability and all rights of any nature with respect thereto, including all insurance recoveries, prepaid premiums, and unearned premiums thereunder and rights to assert claims with respect to any such insurance recoveries; and

(r)     all assets, properties and rights of Seller specifically identified on Schedule 2.2(r).

2.3     Assumed Liabilities Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Purchaser will assume and agree to pay, perform, and discharge only Seller's obligations under the Assigned Leases that arise or are required by the terms of the Assigned Leases to be performed after the Closing Date (only to the extent such obligations do not arise out of or in connection with any breach of contract, tort, infringement, default or nonperformance by Seller under such Assigned Leases) (the "*Assumed Liabilities*").

2.4     Excluded Liabilities. Other than the Assumed Liabilities, neither Purchaser nor any Designated Entity will assume or otherwise be responsible for any Liability of Seller.

2.5     Purchase Price. The purchase price for the sale and transfer of the Acquired Assets will be an amount equal to $1,110,000 (the "*Purchase Price*"); *provided*, if Purchaser adds additional Assigned Equipment pursuant to Section 6.7 after the date hereof, which results in the aggregate Cure Amounts payable by Seller to exceed $10,000, then Purchaser will pay an additional amount equal to the lesser of (a) the amount by which the aggregate Cure Amounts payable by Seller exceeds $10,000, and (b) $10,000.

2.6     Payments to Seller at Closing. At the Closing, subject to the terms and conditions set forth in this Agreement, Purchaser will pay to Seller, immediately available funds to an account designated in writing by Seller in an amount (the "*Closing Payment*") equal to (a) the Purchase Price *less* (b) the Deposit. At the Closing, the Escrow Agent will be directed by Seller and Purchaser in writing to release and deliver the Deposit to Seller.

2.7     Cure Amounts for Assigned Leases. At Closing (or, if the applicable Assigned Lease is not assigned to Purchaser at Closing, then at the time of the assignment of such Assigned Lease to Purchaser, if ever), Seller shall pay to the applicable counterparties the Cure Amounts for the Assigned Leases.

2.8     Deposit. Upon execution of this Agreement by all parties hereto, Purchaser shall deposit with Bronson Law Offices, P.C., as escrow agent (the "*Escrow Agent*"), an amount equal to 10% of the Purchase Price (the "*Deposit*") by wire transfer. If the Closing occurs, the Deposit will be released to Seller in accordance with Section 2.6, and if the Closing does not occur, the Deposit shall be released to Seller or Purchaser, as applicable, in accordance with Section 7.3.

**ARTICLE III**
**CLOSING; CONDITIONS TO CLOSING**

3.1     Closing. Subject to the terms and conditions of this Agreement and the satisfaction or waiver of the conditions set forth in Sections 3.2, 3.3, and 3.4, the closing (the "*Closing*") of the sale and purchase of the Acquired Assets shall take place no less than 1 Business Day after the Approval Order becomes a Final Order, if the conditions to Closing set forth below have been met (or waived) on such date, or such other date as Seller and Purchaser may agree, but in any event on or before the Outside Date if such conditions have been met (or waived) by such date, by the electronic exchange of documents. The time and date upon which the Closing occurs is referred to herein as the "*Closing Date*." All transactions at the Closing

shall be deemed to take place simultaneously and none shall be deemed to have taken place until all shall have taken place.

3.2    Court Approval Required. Purchaser and Seller acknowledge and agree that the Bankruptcy Court's entry of the Approval Order shall be required in order to consummate the Transactions, and that the requirement that the Approval Order be entered is a condition that cannot be waived by any party.

3.3    Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may be waived by Purchaser in its sole discretion:

(a)    Representations and Warranties. The representations and warranties of Seller set forth in Article IV of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on and as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    Agreements and Covenants. Seller shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)    Material Adverse Change. No Material Adverse Change shall have occurred and be continuing.

(d)    No Appeal of Bid Protections Order or Approval Order. No Person shall have appealed the Bid Protections Order or Approval Order, or if any such notice of appeal has been given, the Bid Protections Order or the Approval Order shall have become a Final Order.

(e)    Payment of the Cure Amounts. Seller shall have provided proof of payment of all Cure Amounts, in form reasonably satisfactory to Purchaser (other than with respect to any Cure Amount that relates to an Assigned Lease that is not assigned to Purchaser at Closing, for which Seller shall provide proof promptly after payment of the related Cure Amount).

(f)    Deliveries at Closing. At the Closing, Seller shall deliver, or cause to be delivered, to Purchaser all of the following:

(i)    A certificate from Seller executed by a duly authorized officer thereof certifying to the matters set forth in Section 3.3(a) through 3.3(c).

(ii)    A bill of sale and intellectual property assignments with respect to the Acquired Assets being conveyed by Seller (the "*Bill of Sale*"), duly executed by Seller.

(iii)    An assignment and assumption agreement (the "*Assignment and Assumption Agreement*"), effecting the assignment to and assumption by Purchaser of the Assigned Leases and the Assumed Liabilities, duly executed by Seller;

(iv)    A certificate of non-foreign status executed by Seller, prepared in accordance with Treasury Regulation Section 1.1445-2(b).

3.4    <u>Conditions to Obligations of Seller</u>. The obligation of Seller to consummate the Transactions is subject to the satisfaction, at or before the Closing, of each of the following conditions, any of which conditions may be waived by Seller in its sole discretion:

(a)    <u>Representations and Warranties</u>. The representations and warranties of Purchaser set forth in <u>Article V</u> of this Agreement shall be true and correct in all material respects (except for those representations and warranties qualified by materiality, which shall be true and correct in all respects) on and as of the Closing Date as though made on and as of the Closing Date (except for representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)    <u>Agreements and Covenants</u>. Purchaser shall have performed and complied with each agreement, covenant and obligation required to be performed or complied with by it under this Agreement at or before the Closing in all material respects.

(c)    <u>Receipt of the Closing Payment</u>. Seller shall have received the Closing Payment from Purchaser.

(d)    <u>Deliveries at Closing</u>. At the Closing, Purchaser (or the Designated Entity) shall deliver, or cause to be delivered, to Seller each of the following:

(i)    The Bill of Sale, duly executed by Purchaser (or any applicable Designated Entity).

(ii)    The Assignment and Assumption Agreement, duly executed by Purchaser (or any applicable Designated Entity).

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller represents and warrants to Purchaser, with respect to itself only, severally and not jointly, that the statements contained in this <u>Article IV</u> are true and correct as of the date hereof.

4.1    <u>Organization, Good Standing and Power</u>. Seller is legally formed and in good standing under the law of the State of New York. Subject to the applicable provisions of the Bankruptcy Code, Seller has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

4.2     Authority Relative to this Agreement; Execution and Binding Effect. Seller has all necessary corporate power and authority to execute and deliver this Agreement and the Ancillary Agreements and, subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, to consummate the Transactions applicable to Seller. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by the board of directors of Seller, and, except for Bankruptcy Court approval or as set forth on Schedule 4.4, no other proceedings or approvals on the part of Seller are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Seller. Assuming due authorization, execution and delivery by Purchaser, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Seller, enforceable against Seller in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.3     No Defaults. Subject to receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code and except as set forth on Schedule 4.3, the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of applicable Law, or (ii) Contract, Employee Benefit Plan, power of attorney, commitment, instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injection to which Seller is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach, default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of incorporation or bylaws of Seller.

4.4     Governmental and Other Consents. Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code or as set forth on Schedule 4.4, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Authority or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

4.5     No Brokers. Except for the representation of Seller by Beechwood Capital Advisors ("*Beechwood*"), pursuant to that certain order entered by the Bankruptcy Court on July 21, 2020, and the obligation of Seller to pay Beechwood a commission, fees, and expenses at Closing in accordance with the terms and provisions of such order, Seller has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Seller, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Seller of this Agreement and the Ancillary Agreement and the consummation of the Transactions.

4.6　　Leases. Schedule 4.6 sets forth a true, correct and complete list of all Assigned Leases and Seller's good faith estimate of the Cure Amounts (if any) with respect thereto.

4.7　　Payment of Accrued Compensation for Transferred Employees. Seller has no liabilities for any unpaid compensation owing to any Transferred Employees of the Business.

4.8　　No Other Representations and Warranties. Except for the representations and warranties contained in this Article IV (including the related portions of the Schedules), neither Seller nor any other Person has made or makes any other express or implied representation or warranty, either written or oral, on behalf of Seller, including any representation or warranty as to the accuracy or completeness of any information regarding the Business and the Acquired Assets furnished or made available to Purchaser and its Related Persons.

### ARTICLE V
### REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller that the statements contained in this Article V are true and correct as of the date hereof.

5.1　　Organization, Good Standing and Power. Purchaser is legally formed and in good standing under the laws of the state of its formation. Purchaser has the power to own its properties and carry on its business as now being conducted and is qualified to do business and is in good standing in each jurisdiction in which the failure to be so qualified and in good standing would result in a Material Adverse Change.

5.2　　Authority Relative to this Agreement; Execution and Binding Effect. Purchaser has full power and authority to execute and deliver this Agreement and the Ancillary Agreements and to consummate the Transactions. The execution and delivery of this Agreement and the Ancillary Agreements and the consummation of the Transactions have been duly and validly approved and adopted by all necessary action of Purchaser and no other proceedings or approvals (shareholder, member or otherwise) on the part of Purchaser are necessary to approve this Agreement and the Ancillary Agreements and to consummate the Transactions. This Agreement has been duly and validly executed and delivered by Purchaser. Assuming due authorization, execution and delivery by Seller, this Agreement constitutes, and each of the Ancillary Agreements at the Closing will constitute, the valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with their terms, except as such enforcement may be limited by (a) the effect of bankruptcy, insolvency, reorganization, receivership, conservatorship, arrangement, moratorium or other laws affecting or relating to the rights of creditors generally, or (b) the rules governing the availability of specific performance, injunctive relief or other equitable remedies and general principles of equity, regardless of whether considered in a proceeding in equity or at law.

5.3　　No Defaults. The execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions do not and will not (a) with or without the giving of notice or the lapse of time, or both, conflict with, or result in the breach of or constitute a default under, or result in the modification, cancellation, lapse or termination of, or limitation, or curtailment under, or violate any (i) provision of Law, or (ii) agreement (including any loan or financing agreement), Contract, lease, power of attorney, commitment,

instrument, insurance policy, arrangement, undertaking, order, decree, ruling or injunction to which Purchaser is subject or a party or by which it is bound (or with respect to which its properties or assets are subject or bound), except for any breach, default, modification, cancellation, lapse, termination, limitation, curtailment or violation that would not result in a Material Adverse Change; or (b) violate the certificate of incorporation, bylaws or any comparable instruments of Purchaser.

5.4     <u>Governmental and Other Consents</u>. Except for the receipt of any necessary Bankruptcy Court approval in accordance with the Bankruptcy Code, no consent, notice, authorization or approval of, or exemption by, or filing with or notifications to any Governmental Authority or any other Person, whether pursuant to contract or otherwise, is required in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

5.5     <u>No Brokers</u>. Purchaser has not incurred and will not incur, directly or indirectly, as a result of any action taken or permitted to be taken by or on behalf of Purchaser, any Liability for brokerage or finders' fees or agents' commissions or similar charges in connection with the execution and delivery by Purchaser of this Agreement and the Ancillary Agreements and the consummation of the Transactions.

5.6     <u>Sufficiency of Funds</u>. Purchaser has sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Purchase Price and consummate the transactions contemplated by this Agreement.

5.7     <u>Independent Investigation</u>. Purchaser has conducted its own independent investigation, review and analysis of the Business and the Acquired Assets, and acknowledges that it has been provided adequate access to the personnel, properties, assets, premises, books and records, and other documents and data of Seller for such purpose. Purchaser acknowledges and agrees that: (a) in making its decision to enter into this Agreement and the Ancillary Agreements and to consummate the transactions contemplated hereby and thereby, Purchaser has relied solely upon its own investigation and the express representations and warranties of Seller set forth in <u>Article IV</u> of this Agreement (including related portions of the Schedules); and (b) neither Seller nor any other Person has made any representation or warranty as to Seller, the Business, the Acquired Assets or this Agreement, except as expressly set forth in <u>Article IV</u> of this Agreement (including the related portions of the Schedules); *provided*, *however*, that nothing contained in this <u>Section 5.7</u> shall prevent or preclude Purchaser from asserting a claim for fraud or intentional misrepresentation against Seller.

## ARTICLE VI
## COVENANTS

6.1     <u>Operation of Business</u>.

(a)     Subject to the requirements of, and the obligations imposed upon, Seller as debtor-in-possession and pursuant to the Bankruptcy Code and except as otherwise contemplated by the Agreement or as required to comply with the Cash Collateral Order, from the date hereof and until the Transactions shall have been consummated or abandoned as contemplated herein, Seller shall operate the Business in the ordinary

course and, consistent with such operation and the budget set forth in connection with the Cash Collateral Order, and consistent with acting as a debtor-in-possession in a Chapter 11 bankruptcy case, shall use commercially reasonable efforts to maintain the goodwill associated with the Business and the relationships with the employees, customers, and suppliers of the Business.

(b) From and after the date of this Agreement until Closing, Purchaser and Seller will work in good faith to document, plan and prepare the transition of the Acquired Assets to Purchaser.

(c) From and after entry of the Approval Order, Seller will not, without Purchaser's prior written consent, which consent shall not be unreasonably withheld, (i) issue or become bound by a purchase order for the sale of any goods or services, or (ii) accept or otherwise be bound by any sales order for the sale of goods or services.

6.2     Approval Order.

(a) Prior to the Closing, and subject to the provisions of this Agreement, Purchaser and Seller shall use their commercially reasonable efforts to obtain entry of an order or orders by the Bankruptcy Court pursuant to §§ 363 and 365 of the Bankruptcy Code (the "*Approval Order*"), substantially in the form attached as Exhibit B, reasonably acceptable to the Purchaser, Seller, and Lender.

(b) If the Bid Protections Order or Approval Order or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any person (or a petition for certiorari or motion for rehearing or reargument shall be filed with respect thereto), each party hereto agrees to use commercially reasonable efforts to obtain an expedited resolution of such appeal; *provided*, *however*, that nothing herein shall preclude the parties hereto from consummating the Transactions if the Approval Order shall have been entered and has not been stayed in which event Purchaser shall be able to assert the benefits of § 363(m) of the Bankruptcy Code.

6.3     Inventory Samples; Access to Facilities, Personnel, and Information.

(a) Promptly following the date hereof, Seller shall provide samples of the inventory for each SKU and in the quantities set forth on Schedule 6.3(a), the cost of which shall be split equally between Seller and Purchaser.

(b) Following the date hereof, Seller shall permit representatives of Purchaser to have reasonable access during regular business hours and upon reasonable notice, and in a manner so as not to interfere with the normal business operations of Seller, to management personnel of Seller and to all premises, property, books, records (including Tax records), Contracts, and documents of or pertaining to the Business which are under Seller's control (provided that any representatives of Purchaser shall be subject to the confidentiality obligations under the Confidentiality Agreement or otherwise agree in writing to be bound by the terms of such Confidentiality Agreement applicable to Purchaser thereunder).

(c)     From the Closing Date through and including the second anniversary of the Closing Date, Purchaser shall grant Seller, any Trustee, and their respective representatives reasonable access to the books and records transferred to Purchaser pursuant to this Agreement during regular business hours and upon reasonable notice for the purpose of allowing Seller or its successor, such Trustee, or their respective representatives to perform the duties necessary for the liquidation of Seller's Estate (including preparing tax filings and collecting accounts receivable of Seller). To the extent reasonably required by Seller, Purchaser shall make one or more of its employees available to Seller to assist in Seller's wind-down of its Estate provided that such access does not unreasonably interfere with the conduct of the Business by Purchaser.

6.4     _Further Assurances_. At the Closing, Seller shall, upon Purchaser's request, execute and deliver to Purchaser such other instruments of transfer as shall be reasonably necessary to vest in Purchaser title to the Acquired Assets, and Seller, on the one hand, and Purchaser, on the other hand, shall use its commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary under applicable Law, and execute and deliver such instruments and documents and to take such other actions, as may be required to consummate the Transactions at or after the Closing; _provided_ that nothing shall prohibit Seller from ceasing operations or winding up its affairs following the Closing. In furtherance and not in limitation of the foregoing, in the event that any of the Acquired Assets shall not have been conveyed at Closing, Seller shall use commercially reasonable efforts to convey such Acquired Assets to Purchaser as promptly as practicable after the Closing. To the extent any Excluded Assets contain copies of any Intellectual Property acquired by the Purchaser that have not been or cannot be transferred to the Purchaser, Seller shall cause such copies of Intellectual Property to be permanently deleted within three (3) Business Days following the Closing.

6.5     _Employee Matter_.

(a)     Purchaser (or any Designated Entity) may (but is not obligated to) make offers of ongoing or short-term employment to any employee of Seller in Purchaser's sole discretion (such employees who are hired by Purchaser or a Designated Entity, the "_Transferred Employees_"). Seller shall terminate the employment of all Transferred Employees employed by Seller as of immediately prior to the Closing and reasonably assist Purchaser (or any Designated Entity) to effect the change of employment of such Transferred Employees as of the Closing in an orderly fashion. Purchaser's obligations under this Agreement are not conditioned upon any particular employees agreeing to employment with Purchaser. Seller hereby agrees that Purchaser's (or any Designated Entity's) employment of any Transferred Employee will not violate the rights of Seller or any of its Affiliates with respect to any noncompetition or similar restriction otherwise applicable to any Transferred Employee.

(b)     Seller and Purchaser agree that with respect to the Transferred Employees, pursuant to the "Alternate Procedure" provided in Section 5 of Revenue Procedure 2004-53, with respect to the filing and furnishing of IRS Forms W-2, W-3, W-4 and W-5 and 941, (i) Seller shall report, and Purchaser shall report, on a "predecessor-successor" basis as set forth therein, (ii) Seller shall be relieved from furnishing Forms

W-2 to Transferred Employees for the current calendar year, and (iii) Purchaser shall assume the obligations of Seller to furnish such forms to such Transferred Employees for the full current calendar year; *provided*, that Seller timely provides Purchaser with all necessary payroll records for 2020.

(c)     Nothing in this Agreement shall constitute any commitment, Contract or understanding (expressed or implied) of any obligation on the part of Purchaser (or any Designated Entity) to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser (or a Designated Entity) may establish pursuant to individual offers of employment.

(d)     Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser (or a Designated Entity) to terminate, reassign, promote or demote any of the Transferred Employees after the Closing or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, future benefits, other compensation or terms or conditions of Purchaser's (or Designated Entity's) employment of such employees.

6.6     Tax Matters.

(a)     All sales, use, transfer, stamp, conveyance, value added or other similar Taxes, duties, excises or governmental charges imposed by any Tax authority, domestic or foreign, and all recording or filing fees, notarial fees and other similar costs of Closing will be borne by Purchaser.

(b)     Within 90 days following the Closing Date, Purchaser will prepare (in accordance with Section 1060 of the Internal Revenue Code and the Treasury Regulations promulgated thereunder (and any similar provisions of state, local, or foreign law, as appropriate)) and deliver to Seller a draft Form 8594 allocating the Purchase Price among the Acquired Assets. Seller shall be entitled to review and comment on such schedule for a period of 10 days, and Purchaser shall give due consideration to any such comments in good faith. Thereafter, Purchaser shall provide Seller with Purchaser's final Form 8594. Neither Purchaser nor Seller shall take any position (whether in audits, tax returns or otherwise) that is inconsistent with Purchaser's final allocation schedule. Purchaser and Seller shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

(c)     Seller acknowledges and agrees that it is a US Person within the meaning of Internal Revenue Code Section 1445.

6.7     Designation of Additional Assigned Equipment; Additional Excluded Assets. At any time prior to Closing, with the consent of Seller (which consent will not be unreasonably withheld) Purchaser may (a) update Schedule 2.1(a) to add or remove Equipment (and the related lease, if any), identified on an earlier version thereof, in which case (i) such added Equipment will be additional Assigned Equipment and the related lease, if any, will be an Assigned Lease, and (ii) such removed Equipment shall not be Assigned Equipment and the

related lease, if any, will not be an Assigned Lease, and (b). designate any other asset of Seller to be an Excluded Asset.

6.8 <u>Duty to Complete Asset Removal</u>. No later than November 15, 2020, Purchaser shall remove all Acquired Assets located on the Leased Premises (the "*Asset Removal*"). In the event the Asset Removal is not timely completed (an "*Asset Removal Delay*"), and without prejudice to any other provision herein, Seller shall be entitled to reimbursement from Purchaser for any reasonable expenses incurred as a result of the Asset Removal Delay including, without limitation, rent and lease-related expenses and costs to remove any Acquired Assets from the Leased Premises which were not timely removed by Purchaser.

6.9 <u>Expense Reimbursement and Break-Up Fee</u>.

(a) Subject to approval of the Bankruptcy Court, Seller shall pay the Expense Reimbursement and Break-Up Fee to Purchaser or cause the Expense Reimbursement and Break-Up Fee to be paid to Purchaser, only if Seller shall consummate an Alternative Transaction.

(b) The Expense Reimbursement and Break-Up Fee shall be promptly paid by wire transfer of immediately available funds to an account designated in writing by Purchaser. If applicable, the Expense Reimbursement and Break-Up Fee shall be paid directly to Purchaser out of the purchase price paid by the winning bidder for all or substantially all of the Acquired Assets at closing of such winning bid's purchase, and Seller shall cause such payment to be made as a term of such winning bidder's purchase transaction.

(c) Purchaser's claim in respect of the Expense Reimbursement and Break-Up Fee shall constitute an allowed super-priority administrative expense claim, senior to all other administrative claims against Seller under §§ 503, 507, 363, and 364 of the Bankruptcy Code and shall be *pari passu* in priority with the Lender's super-priority adequate protection administrative expense claims.

(d) Each of the parties acknowledges that:

(i) the agreements set forth in this <u>Section 6.9</u> are an integral part of the transactions contemplated by this Agreement;

(ii) the Expense Reimbursement and Break-Up Fee are not penalties, but rather liquidated damages in a reasonable amount that will compensate Purchaser in the circumstances in which the Expense Reimbursement and Break-Up Fee are payable for the efforts and resources expended by Purchaser and opportunities foregone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the transaction contemplated hereby, which amount otherwise would be impossible to calculate with precision;

(iii) Purchaser would not have entered into this Agreement in the absence of Seller's obligations to pay or cause to be paid the Expense Reimbursement and Break-Up Fee; and

(iv) to the extent that all amounts due in respect to the Expense Reimbursement and Break-Up Fee have not actually been paid to Purchaser, Purchaser shall have additional recourse against Seller for any liabilities relating to or arising from this Agreement.

**ARTICLE VII**
**TERMINATION; EFFECT OF TERMINATION**

7.1     <u>Termination</u>. This Agreement may, by notice given prior to or at the Closing be terminated:

(a)     by mutual consent of Purchaser and Seller;

(b)     by either Purchaser or Seller:

(i)     if the Bankruptcy Court rules that it does not approve this Agreement for any reason or if a Governmental Body issues a final, non-appealable ruling or Final Order permanently prohibiting the Transactions, *provided, however*, that the right to terminate this Agreement pursuant to this <u>Section 7.1(b)(i)</u> shall not be available to any party whose breach of any of its representations, warranties, covenants or agreements contained herein results in such ruling or Final Order;

(ii)     if the Closing shall not have occurred by the close of business on October 30, 2020 (the "*Outside Date*"); *provided* that the right to terminate this Agreement pursuant to this <u>Section 7.1(b)(ii)</u> shall not be available to any party hereto whose breach of any of its representations, warranties, covenants or agreements contained herein results in the failure of the Closing to be consummated by such time;

(iii)     if (A) the Sale Hearing is not held on or before October 16, 2020; *provided, however*, if the Sale Hearing is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available, or (B) the Bankruptcy Court has not entered the Approval Order on or before October 19, 2020; *provided, however,* if approval of the Approval Order is delayed due to the Bankruptcy Court's unavailability, the next Business Day on which the Bankruptcy Court is available;

(iv)     if the Approval Order is vacated; or

(v)     if Seller (A) files any stand-alone plan of reorganization or liquidation that does not contemplate, the implementation or consummation of, the Transactions or (B) consummates an Alternative Transaction, including the transfer of the Acquired Assets to the Successful Bidder; or

(c)     by Purchaser:

(i)     in the event of any breach by Seller of any of its material agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article III to be satisfied, and the failure of Seller to cure such breach by the earlier of (A) the Outside Date, and (B) the date that is ten (10) days after receipt of a Purchaser Termination Notice; *provided, however,* that (1) Purchaser is not in breach of any of its representations, warranties, covenants or agreements contained herein in a manner that would result in the failure of a condition set forth in Article III to be satisfied, (2) Purchaser notifies Seller in writing (the "*Purchaser Termination Notice*") of its intention to exercise its rights under this Section 7.1(c)(i) as a result of the breach, and (3) Purchaser specifies in the Purchaser Termination Notice the representation, warranty, covenant or agreement contained herein of which Seller are allegedly in breach and the specific facts giving rise to such allegation of breach;

(ii)     if the Bid Protections Order is not entered by the Bankruptcy Court by October 8, 2020;

(iii)     if the Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the consummation of the Transactions; or

(iv)     if any conditions to the obligations of Purchaser set forth in Article III shall have become permanently incapable of fulfillment other than as a result of a breach by Purchaser of any representation, warranty, covenant or agreement contained in this Agreement; or

(d)     by Seller:

(i)     except as provided in Section 7.1(d)(ii), in the event of any breach by Purchaser of any of its agreements, covenants, representations or warranties contained herein that would result in the failure of a condition set forth in Article III to be satisfied, and the failure of Purchaser to cure such breach by the earlier of (A) the Outside Date, and (B) the date that is ten (10) days after receipt of the Seller Termination Notice; *provided, however,* that Seller (1) is not itself in material breach of any of its representations, warranties, covenants or agreements contained herein, (2) notifies Purchaser in writing (a "*Seller Termination Notice*") of its intention to exercise its rights under this Section 7.1(d)(i) as a result of the breach, and (3) specifies in the Seller Termination Notice the representation, warranty, covenant or agreement contained herein of which Purchaser is allegedly in breach and the specific facts giving rise to such allegation of breach;

(ii)     if the Approval Order with respect to the Transactions has been entered and is not subject to any stay on enforcement and (A) Seller has provided Purchaser with written notice that it is prepared to consummate the Transactions, (B) the conditions to Closing in Article III have been satisfied (or

waived by Purchaser), other than those conditions that by their nature can only be satisfied at Closing, and (C) the Closing Date does not occur within three Business Days of Seller providing Purchaser with such notice; or

(iii)     if the aggregate Cure Amounts payable by Seller exceed $65,000.

7.2     <u>Effect of Termination</u>. If this Agreement is terminated pursuant to <u>Section 7.1</u>, then (a) Purchaser shall have no Liability or obligations under this Agreement except for the forfeiture of the Deposit on the terms and conditions set forth in <u>Section 7.3</u>, and (b) Seller shall not have any Liabilities under this Agreement other than the payment of the Expense Reimbursement and Break-Up Fee if and to the extent provided in <u>Section 6.9</u> and to cause the return of the Deposit to Purchaser; *provided*, *however*, that the obligations in <u>Section 8.1</u> shall survive.

7.3     <u>Deposit</u>. If Seller terminates this Agreement pursuant to <u>Section 7.1(d)(i)</u> with respect to a breach by Purchaser, then the Deposit (together with any interest and income thereon) shall be forfeited to Seller (as Sellers' sole and exclusive remedy with respect thereto). If this Agreement is terminated pursuant to <u>Section 7.1</u> for any other reason, the Escrow Agent shall return the Deposit (together with any interest and income thereon) to Purchaser.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1     <u>Transaction Expenses</u>. Except as expressly provided for herein, each party shall pay all fees, costs and expenses incurred by it with respect to this Agreement, whether or not the Transactions are consummated.

8.2     <u>Certain Interpretive Matters and Definitions</u>. Unless the context requires, (a) references to the plural include the singular and references to the singular include the plural, (b) references to any gender includes the other gender, (c) the words "include," "includes" and "including" do not limit the preceding terms or words and shall be deemed to be followed by the words "without limitation", (d) the terms "hereof", "herein", "hereunder", "hereto" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement, and (e) all references to Sections, Articles, Exhibits or Schedules are to Sections, Articles, Exhibits or Schedules of or to this Agreement.

8.3     <u>Termination of Representation and Warranties</u>. The representations and warranties of the parties set forth in this Agreement shall terminate and be of no further force or effect after the Closing.

8.4     <u>Amendment</u>. This Agreement may be amended or modified in whole or in part at any time by an agreement in writing among the parties.

8.5     <u>Waiver</u>. The waiver by a party of a breach of any covenant, agreement, condition or undertaking contained herein shall be made only by a written waiver in each case. No waiver of any breach of any covenant, agreement, condition or undertaking contained herein shall operate as a waiver of any prior or subsequent breach of the same covenant, agreement,

condition or undertaking or as a waiver of any breach of any other covenant, agreement, condition or undertaking.

8.6    Notices. All notices, request and other communications hereunder will be deemed to have been duly given if delivered personally, by an established overnight delivery company, or by certified or registered mail, postage prepaid, return receipt requested as follows:

If to Seller:

> Edison Price Lighting, Inc.
> Attention: Emma Price
> c/o Bronson Law Offices, P.C.
> 480 Mamaroneck Ave.
> Harrison, NY  10528
> Attention: Bruce Bronson
> E-mail: hbbronson@gmail.com

> with a copy to (which will not constitute notice):

> Bronson Law Offices, P.C.
> 480 Mamaroneck Ave.
> Harrison, NY  10528
> Attention: Bruce Bronson
> E-mail: hbbronson@gmail.com

If to Purchaser:

> Current Lighting Solutions, LLC
> 1975 Noble Road
> East Cleveland, OH  44112
> Attention: Inger Eckert
> Email: inger.eckert@gecurrent.com

> with copies to (which will not constitute notice):

> Fredrikson & Byron, P.A.
> 200 South Sixth Street, Suite 4000
> Minneapolis, MN  55402
> Attention: Clinton E. Cutler; Sean P. Kearney
> E-mail: ccutler@fredlaw.com; skearney@fredlaw.com a

> and

> American Industrial Partners
> 450 Lexington Avenue 40th Floor
> New York, NY  10017

Attention: General Counsel
Email: notices@americanindustrial.com

or to such other address as may hereafter by designated by a party by the giving of notice in accordance with this Section 8.6. All notices, request or other communications shall be deemed given when actually delivered personally or by an established overnight delivery company or upon actual receipt if delivered by certified or registered mail, postage prepaid, return receipt requested.

8.7     Jurisdiction. The parties agree that the Bankruptcy Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement or the implementation or breach hereof.

8.8     Governing Law. To the extent not governed by the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to rules governing the conflict of laws.

8.9     Time is of the Essence. Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

8.10    Severability. If any provision of this Agreement shall be held invalid, illegal or unenforceable, in whole or in part, the validity, legality, and enforceability of the remaining part of such provision, and the validity, legality and enforceability of all other provisions hereof or thereof, shall not be affected thereby.

8.11    Titles and Headings. Titles and headings of sections of this Agreement are for convenience of reference only and shall not affect the construction of any provision of this Agreement.

8.12    Assignment; Successors and Assigns. This Agreement and the rights, duties and obligations hereunder may not be assigned by any party without the prior written consent of the other party, and any attempted assignment without consent shall be void. Subject to this Section 8.12, this Agreement and the provisions hereof shall be binding upon each of the parties, their successors and permitted assigns.

8.13    No Third-Party Rights. The parties do not intend to confer any benefit hereunder on any Person other than the parties hereto.

8.14    Confidentiality Agreement. The parties acknowledge that, except as otherwise provided herein, the Confidentiality Agreement dated as of October 9, 2019, between AIP, LLC and Seller shall remain in full force and effect during the term specified therein.

8.15    Entire Agreement. This Agreement, the Ancillary Agreements and the Confidentiality Agreement constitute the entire agreement between the parties regarding the subject matter hereof and no extrinsic evidence whatsoever may be introduced in any proceeding involving this Agreement, the Ancillary Agreements or the Confidentiality Agreement.

8.16     Execution of this Agreement. This agreement may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same agreement. The exchange of copies of this Agreement and of signature pages by electronic transmission shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original Agreement for all purposes. Signatures of the parties transmitted by electronic transmission shall be deemed to be their original signatures for all purposes.

*** Signature page follows ***

IN WITNESS WHEREOF, the parties have caused their duly authorized officers to execute this Agreement as of the date and year first written above.

**SELLER**:

**EDISON PRICE LIGHTING, INC.**

_____

By: Emma Price
Its: President

**PURCHASER:**

**CURRENT LIGHTING SOLUTIONS, LLC**

_____

By:     John Irvine
Its:    Chief Financial Officer

## EXHIBIT A

**Bid Protections Order**

**Approval Order**